PEISNER *v.* STATE

[No. 363-A, September Term, 1963.]

*Decided July 27, 1964.*

*Motion to recall and stay mandate filed September 9, 1964, granted September 16, 1964.*

The cause was argued before BRUNE, C. J., and HAMMOND, PRESCOTT and HORNEY, JJ., and RUTLEDGE, J., Associate Judge of the Fourth Judicial Circuit, specially assigned.

*Allen A. Sperling,* with whom was *Arthur A. Peisner, pro se,* on the brief, for the appellant.

*Franklin Goldstein, Assistant Attorney General,* with whom were *Thomas B. Finan, Attorney General, Leonard T. Kardy, State's Attorney for Montgomery County,* and *Alfred Burka, Assistant State's Attorney,* on the brief, for the appellee.

RUTLEDGE, J., by special assignment, delivered the opinion of the Court.

The defendant-appellant, Arthur A. Peisner, was indicted on six counts charging him with conspiracy, along with Robert H. Symonds, David Lerner and Morton Lifshutz, to defraud the depositors of the Mutual Security Savings and Loan Association, hereafter called Mutual, (three counts) and to defraud said Mutual (three counts). A jury found him guilty on all counts, and he was sentenced to nine years' imprisonment on each count, the sentences to run concurrently. From the judgment and sentences Peisner appeals.

The appellant, both an accountant and a member of the District of Columbia Bar, but not of the Maryland Bar, was offered counsel by the trial court, but he declined and elected to try his own case. Only after his conviction and shortly before his appeal was to be heard by this Court did he employ counsel.

The appellee filed a motion to dismiss the appeal on the ground that the appellant failed to print necessary excerpts from the Record, failed to print the charge to the jury as required by Maryland Rule 828 b 1 (a), and even failed to print many pages which he indicated he would print. The appellee, however, printed the necessary excerpts in its Appendix, and the motion will be denied. *Bergen v. State,* 234 Md. 394.

The conspiracy with which Peisner was charged, reduced to simple form from a tremendous maze of testimony, was sub-

stantially this: the appellant agreed with the said Lerner, Lifshutz and Symonds to operate a building and loan company in Maryland, along with other companies which they controlled, and to attract depositors by advertising dividends of 5% although at the time they so advertised they had no idea what dividends Mutual could honestly afford to pay. They formed a veritable "covey" of corporations all controlled by the same group, but only three of these figured prominently in the trial. These were Wayne Investment Company (Wayne), Kentland Construction Corporation (Kentland), and Mutual. All money was funneled into Wayne, or as one officer, Lerner, put it, "There was a free transfer of moneys between these corporations which would seem to indicate that they are one and the same although each one of the corporations did different things." Symonds said that he considered the three corporations to be actually one.

The appellant said that he was legal counsel for all three corporations, and an officer in Wayne and Kentland. The four agreed to keep no books for the corporations and the sum of around $3,000,000 is still unaccounted for. There was an agreement between the appellant, Lifshutz and Symonds (Lerner received only $150 per month) that each should draw from the corporations or any of them such sums as their needs or desires might require. Apparently the relationship between the three, as long as the money lasted, was most harmonious. The money they drew was, however, in large part, the money which depositors had been induced to deposit upon a representation that 5% dividends would be paid.

The appellant testified "There were times when we decided we needed income, personal income, and checks were drawn as we decided, on the theory that these corporations (i.e., Wayne and Kentland) were owned by us. We did not feel it necessary to hold a formal meeting of a board of directors when there were only three directors, only three officers, and the three officers knew if any salary or disbursements were made."

Not only did the three draw money out of the corporations for themselves, but drew money out to lend to acquaintances without the knowledge of each other. Peisner testified that without his knowledge, although he was an officer in Wayne,

Symonds loaned money out of Wayne to a Mr. Hirsh, and also loaned money to a Mr. Rosenkoff and a Mr. Rosenstein "who also were in the money-lending business."

About seventy deeds of trust were recorded in October or November 1961. These were drawn in favor of Mutual and purported to represent values in excess of a million dollars. Yet they were, in the appellant's own words, "fictitious, by and large. * * * these trusts bore no relation to the value of the property and were greatly in excess of any value on the property and were just plain fictitious and manufactured." The appellant disclaimed any knowledge of or responsibility for the deeds of trust, and argues that the fictitious amounts were filled in after he had left the corporations. The testimony of Symonds, however, is to the effect that Peisner was the man responsible for the preparation of the deeds of trust.

It appeared that Peisner took money out of, or drew a salary from Kentland and Wayne; he drew no salary from Mutual but had the use of a station wagon belonging to Mutual and he and his family used credit cards of Mutual. Such use rebuts his claim that he severed connections with the corporations after July 1, 1961 because he continued to use the station wagon and the credit cards thereafter, as well as the airplane hereinafter mentioned, and a Cadillac or two, although Peisner was not sure which corporation it was that paid for the Cadillac. It may well be that after July 1, 1961 the corporations did not receive counsel and guidance from Peisner, yet as his remunerations in one form or another continued, it can be said that his severance from the corporations and the conspiracy after July 1, 1961 was, at most, a partial one.

The operations of the business of Mutual through Symonds, Lifshutz and Peisner can scarcely be characterized as the usual operations of a building and loan association. These operations, set forth in the testimony of the appellant himself, included the following:

(a) A loan of $30,000 from Mutual to Peisner to build a house which was put in the name of Symonds because Peisner's credit rating was poor. A mortgage was obtained from an insurance company upon a misrepresentation that the house cost considerably more than $30,000 in order to justify a loan of

that amount. Said the appellant, "This I have done with great frequency in every building and loan association in Washington."

(b) Although Mutual purported to be a building and loan association, and the appellant testified that he advised Symonds and Lifshutz as to proper procedure for running a savings and loan association, Mutual did not even observe the formality of forming an appraisal committee.

(c) Two large paintings were purchased from Hausner's Restaurant in Baltimore with funds drawn from Wayne. Peisner did later repay the amount spent when a receiver in bankruptcy ordered it.

(d) About $14,500 was taken from Kentland to pay for advertisements in the New York Times and the Washington Post for an organization known as the Beachhead Brigade for Cuban Freedom. Peisner described himself as general counsel for the organization, and was an officer in Kentland, but told the jury that he did not know who authorized the payment out of Kentland funds.

(e) In the Spring of 1961 Wayne bought a Beechcraft airplane. The explanation given by the appellant was that Wayne or Kentland or another corporation controlled by Symonds, Lifshutz and Peisner bought a hotel in Florida and better transportation than rail and bus was needed. The explanation does not cover why Peisner also made trips in the plane to San Domingo, Haiti and Las Vegas. Expenses of the trips were charged to Wayne Corporation.

About November 1961 Peisner sold the airplane to a Dr. Barnett, a brother of the Governor of Mississippi. By that time the airplane had become Peisner's own, according to his testimony, because he took it in part payment when he sold his stock in Wayne, although other witnesses denied this was a fact. The change in ownership was confirmed (at least in Peisner's mind) by the fact that when he sold the airplane he pocketed the money. Yet he admits that when he signed the bill of sale for it he signed as president of Wayne.

(f) Peisner bought a fur coat for his wife for $2,652.31 with his personal check which was returned for insufficient funds. Peisner was out of town when the check was returned

and Symonds paid for the coat with funds from Wayne. Upon his return he says Symonds told him, "Well, we'll just consider this as part of your salary." Peisner told the jury that the fur coat transaction "at first blush might appear spectacular."

He characterized the manner in which business was conducted by the three corporations as "haphazard".

The appellant elected to take the witness stand and made a lengthy statement concerning practically every phase of the corporations' operations, covering rather exhaustively every main point and ramifications of the involved and unusual operations of the three corporations involved.

In the course of the four-day trial, in a voice which the appellant states was audible to the jury, the Assistant State's Attorney once raised objection to "the lies that this man [the appellant] is mouthing", and also said that he had "millions".

Neither in the brief he prepared himself, nor in the memorandum in place of a reply brief prepared by his counsel and submitted after the argument, does the appellant raise any question as to the sufficiency of the evidence to sustain the conviction. The questions raised on behalf of the appellant, properly presented, are these :

1. Assuming that certain evidence was improperly admitted, did the appellant waive any error in its admission by failure to object; and if not, was the error waived or rendered harmless

(a) by the fact that the appellant proceeded to cross-examine the witness on the same subject matter, or

(b) his failure to object when the same evidence was offered subsequently, or

(c) by the appellant's subsequently offering testimony including his own on the same subject matter?

2. Did the trial court err in not granting a mistrial because of the allegedly improper remarks of the Assistant State's Attorney?

3. Was the appellant deprived of a fair trial under the due process clause of both the United States and the Maryland Constitutions even though questions may not have been preserved or may have been imperfectly preserved?

I

(a) The general rule in Maryland is that one does not lose the benefit of objection to inadmissible testimony by cross-examining on the subject. The rule has been clearly stated in simple language. "When testimony has been admitted and an exception noted [now, over objection], counsel may deem it necessary to cross-examine the witness on the subject, and if it is simply a cross-examination he ought not to be deprived of his exception, provided the record shows he does not intend thereby to waive it, and that ought to be inferred when it is strictly cross-examination." *MacEwen v. State,* 194 Md. 492. See also *Jones v. State,* 205 Md. 528.

Assuming, *arguendo,* that the appellant confined his examination to simple cross-examination, and that his objections, if proper, were not waived, still the objections must meet the tests laid down in (b) and (c) below in order for any errors to be reversible.

(b) The appellant concedes the general rule that where testimony objected to comes in later without objection from another witness, there can be no successful claim on appeal that the original error, if any, was prejudicial. Rule 522 d 2; *Journigan v. State,* 223 Md. 405, cert. den. 365 U. S. 853, 81 S. Ct. 818, 5 L. Ed. 2d 817. But he cites *Asner v. State,* 193 Md. 68, contending that this case creates an exception which enures to the benefit of the appellant in his case.

We do not so read the *Asner* case. There the Court affirmed the general rule and said, "We have no intention of relaxing this rule; as we believe it to be salutary and in the interest of justice." The Court there held that where a search warrant was issued, and the defendant made a motion to quash, objected to one officer testifying as to what was obtained by the search, but did not object again when another officer testified as to what was obtained by the search, the question was sufficiently raised by his motion to quash, reiterated by his objection. We find no exception to the general rule was created by the *Asner* case.

(c) The appellant also concedes the general rule that a party waives his objection to testimony by subsequently offering testimony on the same matter. *Connor v. State,* 225 Md.

543, *certiorari denied* 368 U. S. 906, 82 S. Ct. 186, 7 L. Ed. 2d 100. He seeks, however, to circumvent the force of the rule by relying on *Mazer v. State,* 179 Md. 293. We do not find that case apposite. It dealt with an unlawful search and seizure, which were not present here.

A number of objections made by the appellant must be resolved in the light of the discussion above. Assuming *arguendo* that the appellant's objections were well taken, and that evidence was erroneously admitted, the question then becomes whether the error was rendered harmless under the rules as discussed under (a), (b), or (c). We will discuss two which are illustrative of the others.

Over objection Mr. Docter was allowed to testify that Symonds said that he, Symonds, Lifshutz and Peisner agreed to take money whenever it was available. Thereafter he testified, without objection, that Peisner admitted the same thing.

Mr. Symonds testified. To the question, "Did you consider them [the three corporations] to actually be one corporation?" he replied, "I did", and to the question, "But the three of you [Lifshutz, Symonds and Peisner] had all the authority to basically take money at the time you felt you needed it, or when you felt you needed the money?" he replied, "That is correct."

The appellant himself, on cross-examination, testified that he drew a basic salary of $250 weekly from Wayne, and further said, "There were frequently times when there was monies in excess of that which weren't needed for bills and I would draw a larger sum than $250."

We conclude that evidence to the same effect as that given by Mr. Docter, which was objected to by the appellant, was clearly shown by other competent testimony, including that of the appellant himself, and that the error, if any, in admitting Mr. Docter's testimony was thus rendered harmless.

The appellant objected to testimony about a check for $2,-652.31 in payment of a mink coat for Mrs. Peisner. He argues the check itself was the best evidence.

Without going into a discussion of the best evidence rule which this Court recently had occasion to discuss in *General Builders v. MacArthur,* 228 Md. 320, and recognizing that the cancelled check itself was the best evidence, the Court cannot

ignore the record. The appellant undertook to discuss the check and all the circumstances surrounding it, admits that the check was drawn on the Wayne account, and seeks to defend on the ground that somehow the money or the fur coat constituted his wages. Whatever advantages the best evidence rule might have afforded the appellant were waived and discarded by the appellant himself.

In addition to the objections above discussed, the appellant made numerous other objections similar in nature. It would serve no useful purpose and would unduly prolong this opinion to consider each separately. In every case the error, if any, in admitting evidence was rendered harmless by the introduction of competent evidence proving the same facts, or by the appellant's failure to object when evidence covering the same matter was subsequently introduced. We have examined each assignment of error and are unable to find any reversible error therein.

II

The allegedly improper remarks by the Assistant State's Attorney occurred in the following context. In the course of the four-day trial a dispute arose between the appellant and the prosecutor concerning the use by the appellant (without paying him) of a handwriting expert employed by the State in connection with the authenticity of certain purported signatures of the defendant. When the appellant told the court that he had offered "to stipulate to the State's Attorney that we would accept the testimony as binding of the State's handwriting expert. And Mr. Burka [the Assistant State's Attorney], who very glibly says to you — ", Mr. Burka interrupted (apparently goaded by what he obviously felt was an untrue statement concerning a proffered stipulation, and by the use of the word "glibly"), and stated, "Your Honor, I object to the lies that this man is mouthing. I hardly want to speak to him, much less talk to him." The appellant made no objection or motion for a mistrial at this point. After another statement by the appellant, Mr. Burka further said, "If he wants to pay him [the State's handwriting expert] he can have him. He's got millions. He can pay for these things." The appellant then objected "to the remarks", but again failed to move for a mistrial or request

the court to instruct the jury to disregard the remarks. Sometime later in the trial the appellant made a motion for a mistrial and set forth a number of grounds, but failed to refer to the remarks of the Assistant State's Attorney which have been mentioned.

The appellant cites *Wood v. State,* 192 Md. 643, but in that case the Court refused to grant a motion for a mistrial, stating (at p. 652), "Where, as here, the record convinces us that the statements were unimportant in the course of a tense trial, and not an evidence of a proceeding dominated by prejudice and passion, reversal would not promote the ends of justice." He also cites *Contee v. State,* 223 Md. 575, where this Court reversed the conviction of a Negro for rape of a white woman where the Court found that an appeal to racial prejudice had been made to the jury by the State's Attorney. No such matter is presented in this case.

The remarks of the State's Attorney in this case were, of course, not proper, but in a situation of this nature it is often a matter of judgment in trial tactics whether to ignore improper remarks or whether to move for a mistrial or request the court to caution the jury and thus emphasize the remarks. Apparently it was the judgment of the appellant in this instance not to emphasize the remarks since he failed both to move for a mistrial or to ask the trial court to caution the jury to disregard the remarks. Since he thus exercised his own judgment, and remembering that he is a lawyer, this Court is not impressed by his argument now that the trial court erred in its judgment by not, on its own initiative, doing what he chose not to request. There was no showing or claim below that the jury were misled or influenced to the prejudice of the appellant by the remarks of the prosecutor. See *Glickman v. State,* 190 Md. 516, 521. In any event, the failure of the appellant to request a mistrial or a cautionary instruction would appear to be a waiver. Cf. *Basoff v. State,* 208 Md. 643, 650. We find no reversible error on the part of the trial court in this regard.

### III

Finally, the appellant argues that "the great number of errors" appearing on the record had such a cumulative effect as to substantially deprive the appellant of a fair trial in violation

of the due process clause of the Fourteenth Amendment to the United States Constitution, and Article 23 of the Maryland Declaration of Rights, even though questions may not have been preserved or were imperfectly presented.

The answer to this contention is two-fold. First, the so-called "great number of errors" have already been considered by this Court under the heading of the first two questions raised by the appellant, and further consideration is therefore not required. Second, we fail to note any reluctance or reticence on the part of the appellant in presenting questions whether they were properly preserved or not. He presented numerous questions. These we have considered fully, and we find that there was no reversible error in his trial below.

The judgment of conviction must be affirmed.

*Judgment affirmed, with costs.*