805 A.2d 1177

ELKTON CARE CENTER ASSOCIATES LIMITED PARTNERSHIP t/a Medpointe

v.

QUALITY CARE MANAGEMENT, INC.

No. 335, Sept. Term, 2001.

Court of Special Appeals of Maryland.

Aug. 29, 2002.

534

Peter S. Saucier (Thomas A. Bowden and Kollman & Saucier, P.A., on brief), Baltimore, for appellant.

Howard G. Goldberg (Robin G. Banks and Goldberg, Pike & Besche, P.C. on brief), Baltimore, for appellee.

MURPHY, C.J., EYLER, JAMES R., CHARLES E. MOYLAN, JR., (Ret'd, specially assigned), JJ.

MURPHY, C.J.

In the Circuit Court for Cecil County, a jury (the Honorable Dexter M. Thompson, Jr., presiding) found that Elkton Care Center Associates Limited Partnership t/a Medpointe (Medpointe), appellant, breached its contract with Quality Care Management, Inc. (QCM), appellee. Appellant argues that it is entitled to a new trial and, in support of that argument, presents two questions for our review:

1. Whether the inadvertent disclosure during discovery of a memorandum containing communications protected by the attorney-client privilege and the work product doc-

trine constituted a waiver of Medpointe's right to claim said protections at trial?

2.  Whether the trial court's decision, over Medpointe's objections, to permit the jury to hear evidence of communications protected by the attorney-client privilege and the work product doctrine was harmless error?

For the reasons that follow, we shall affirm the judgment of the circuit court.

## Factual Background

Appellant constructed a nursing home in Elkton, Maryland and on June 27, 1994, entered into a Nursing Center Management Agreement with appellee. The agreement, which provided that appellee would manage the nursing home for an initial term of three years, included the following "termination" clause:

11.  Termination. The Owner shall have the right to terminate this Agreement and the employment of the Manager, and except as to liabilities or claims which shall have accrued or arisen prior to such termination, all obligations hereunder shall cease upon the happenings of any of the following events:

(1) If the Manager files ... bankruptcy....

(2) By the taking of the entire or a substantial portion of the Facility, or its services, through lawful condemnation proceedings by any governmental authority.

(3) The loss by the Owner ... due to its default on any mortgage or other obligation, or by operation of law.

(4) .... substantial damage or destruction of the Facility by fire or other casualty ...

(5) The giving of written notice by either party or the other if a party has been grossly negligent in the performance of its obligations under this Agreement (including, without limitation, failure to obtain the initial operation license for the Facility or causing the Facility to be in danger of losing its operating license, although State and/or Federal deficiencies including, but not limited to, fast track impositions, are

not in and of themselves uncommon nor decisive indication of negligence on the part of Q.C.M., or qualification as a health care provider for Medicare or Medicaid reimbursement purposes) and such notice sets forth the details of such alleged breach, and the defaulting party shall not, within thirty (30) days after the mailing of such notice, have cured such breach, or if such breach is of a nature that it cannot be cured within such (30) day period have commenced and at all times thereafter have diligently proceeded with all acts required to cause such breach. Any such termination shall be without prejudice, however, to any and all rights and remedies of the non-defaulting party.

(6) Failure to maintain 85% occupancy after twenty-four (24) months of operation if directly and unequivocally due to gross negligence on the part of Q.C.M.

(7) At the completion of the first twenty-four month period of operation Owner shall review the past twenty-four (24) months performance of the Manager. If the operational and economical goals as agreed between parties at the inception of this Agreement have not been met Owner has the unequivocal right to terminate or amend this Agreement.

(a) Operational Goals. The Facility shall have a trained staff capable of providing services that meet all local, state and federal requirements.

(b) Economical Goals. Net income before taxes at the end of the first twenty four (24) months operational period shall be within the parameters of the Budgets of the Facility as determined by the public accounting firm specializing in long term care reimbursement and as agreed upon by both Owner and Q.C.M.

If budgeted goals are not met due to unforeseen events which were not directly the fault of Q.C.M., Q.C.M. shall not be considered negligent, such as but not limited to a reduction in Medicare/Medicaid reimbursement, etc.

Q.C.M. makes no guarantees that operational and economic goals will be obtained although the intent of Q.C.M. is to attain and/or exceed Budget and Owner expectations. (8) The sale of the property by the Owner....

-During the third year the Manager will be paid his fee through the date of termination.

In November of 1996, appellant terminated its agreement with appellee pursuant to Paragraph 11(7) of the Nursing Center Management Agreement. In April of 1998, appellee sued appellant for "wrongful termination" of the agreement.

## Procedural History

During the discovery phase of this case, pursuant to a request for document production, a lawyer in the firm that was then representing appellant produced a box that contained a number of documents. It was agreed that (1) appellee's counsel would examine the documents in the box and identify which documents they wanted copied, and (2) appellant's counsel would make, and deliver to appellee's counsel, a copy of each document that had been "tabbed" by appellee's counsel. Included among these documents was a memorandum from a lawyer to Mr. Willits, the president of Medpointe, who had retained that lawyer's firm to determine what defenses would be available to appellant if appellee filed a wrongful termination action. This memorandum was expressly designated as "ATTORNEY/CLIENT PRIVILEGE ATTORNEY WORK PRODUCT PREPARED IN ANTICIPATION OF LITIGATION." The memorandum was tabbed by appellee's counsel, and a copy was later forwarded to appellee's counsel along with copies of other tabbed documents.

At trial, appellant's trial counsel called Mr. Willits, who testified as follows during his direct examination:

Q. And what I'd like to do is to cut right to the chaff [sic], if I could. I'd like you to point the ladies and gentleman of the jury to the section of the contract that Medpointe relies upon in terminating its management contract with OCM.

A. It's on Page 10.

Q. We are on Joint Exhibit Number 1?

A. Right.

A. Subsection—or Section 7.

Q. What portions of that section of the contract does Medpointe rely upon in saying that it had the unequivocal right to terminate the agreement?

A. The portion re[sic]lied upon—two, first one A and B. QCM did not meet their operational goals, nor did they meet their economic goals.

Q. How is it that they did not meet their operational goals?

A. They didn't have a trained staff that maintained a quality of health care consistent with state and federal regulations. Additionally, they didn't have a trained staff that maximized the reimbursement rates for Medicare; and their trained staff was not capable, according to the state, of providing in-house education for the employees of Medpointe.

Q. Can you tell the ladies and gentleman of the jury how is it they failed to meet their economic goals?

A. The economic goals were established by the budget projections of May of '94, which the did not come close to meeting.

Q. Now you say their budget projections, what are you referring to?

A. The projections that were prepared by Wolpoff & Company in May of '94, they are an exhibit, because I've seen them before in these proceedings.

\*      \*      \*

Q. In that October–November 1996 time frame when the management contract is terminated, can you give the ladies and gentleman of the jury a sense of what the economic or financial condition of the facility was?

A. The facility had a loss of approximately $800,000, and—

THE COURT: What period are we talking about?

[APPELLANT'S COUNSEL]: October—November 1996 time period that—the contract termination time period.
A. The facility had a loss of some $800,000, and we were maximized on our—maximized on our line of credit to something in excess of a million dollars.

The following transpired during Mr. Willits' cross-examination:

[APPELLEE'S COUNSEL]: Isn't it true that it wasn't until after March of 1997 when [the] lawyer [retained by MedPointe's principal owner] told you that you had breached the contract by improperly terminating it, that you first came up with the excuse that you testified to today?

[APPELLANT'S COUNSEL]: Your Honor, I object to that.

THE COURT: Approach the bench.

\* \* \*

THE COURT:....Have you all discussed this yet? Has everybody knew this was coming?

[APPELLANT'S COUNSEL]: No, no, judge.

THE COURT: Where did it come from?

[APPELLEE'S COUNSEL]: They produced it in their documents. We tabbed it. They copied it. They sent it to us. I intend to use it.

[APPELLANT'S COUNSEL]: I have no idea. I am not calling him a liar. I just have no idea.

THE COURT: You better get together and discuss this ... you might have a waiver.

A luncheon recess occurred at this point. The following transpired when the proceedings resumed:

THE COURT: ... How did you get this, by requesting documents?

[APPELLEE'S COUNSEL]: We filed a request for production of documents, that was responded to; we went over, we inspected the documents. It was among them. We said we want a copy, I think, of everything—or did you just tab it?

[APPELLEE'S CO–COUNSEL]: Your Honor, there was a—we got about a half full box, bankers box of documents that the other side produced.

THE COURT: From whom?

[APPELLEE'S CO–COUNSEL]: From the law firm representing the [appellant], and I tabbed the documents. I did not tab every document. I tabbed the documents I wanted. This was among them. We received documents in a—just a manila envelope from the—with a white first class sticker on it. I showed them to [appellee's counsel] when I got them, and that's what she wrote.

The following transpired after Judge Thompson decided that appellee's counsel could use the memorandum during Mr. Willits' cross-examination:

[APPELLEE'S COUNSEL]: Mr. Willits[,][sic] in March of 1997[,][sic] four months after you terminated [the operator's] contract or his company's contract[,][sic] you sought advise from a law firm in Carroll County or Baltimore ... [I]s that correct?

[APPELLANT'S COUNSEL]: Objection[,][sic] your Honor.

MR. WILLITS: That's correct.

[APPELLEE'S COUNSEL]: And you requested that law firm to give you an analysis of the situation involving the termination of Quality Care[,][sic] and strategy suggestions to prepare for a defense of a possible lawsuit. [I]sn't that true[sic] sir?

[APPELLANT'S COUNSEL]: Objection[,][sic] Your Honor.

THE COURT: Overruled.

MR. WILLITS: We asked the law firm for their opinion of what the contract said.

\*　　\*　　\*

[APPELLEE'S COUNSEL]: Did they not advise you—subject to your lawyer's objection[,][sic] did they not advise you[,][sic] "Under the plain language of the terms and

conditions of the Agreement governing its termination[,][sic] Medpointe has not yet properly terminated the agreement"?

MR. WILLITS: That was their reading of the contract. [C]orrect.

THE COURT: Now ladies and gentleman. [U]nderstand that this is an opinion rendered by a law firm that didn't come in evidence that you can say, well the law firm said this[,][sic] therefore[,][sic] they didn't meet it. This is just solely given to you as to why Mr. Willits or the company may have done what they did afterwards. So that opinion may be a right opinion or wrong opinion. You are going to decide the issues of the case[,][sic] not a law firm.

Go ahead.

[APPELLEE'S COUNSEL]: And it was after this opinion[,][sic] Mr. Willits[,][sic] that you decided to latch onto Paragraph 7.[I]sn't that right[,][sic] sir?

MR. WILLITS: Wrong.

[APPELLANT'S COUNSEL]: Objection[,][sic] your Honor.

THE COURT: Overruled.

MR. WILLITS: Wrong.

THE COURT: He said wrong.

*   *   *

[APPELLEE'S COUNSEL]: Strike that. Before I get back to that. Didn't you also ask the law firm to give you a strategy to prepare for a defense of a possible lawsuit against it by—against you by OCM?

[APPELLANT'S COUNSEL]: Objection.

MR. WILLITS: I don't remember.

THE COURT: Overruled.

[APPELLEE'S COUNSEL]: Let me show you a document which has been marked as Exhibit—Plaintiff's Exhibit 15. Can you identify this document[,][sic] sir?

MR. WILLITS: That's the memorandum from [the lawyer retained in March of 1997].

[APPELLEE'S COUNSEL]: Okay. And would you read to the jury the last sentence in the introductory? Why don't you just read the whole first introductory paragraph.

[APPELLANT'S COUNSEL]: Your Honor, my understanding of why this is being presented to the witness is not—for purposes of refreshing his recollection. This is not a document that has been—at least at this point in time is not in evidence.

THE COURT: Well[,][sic] I'm going to overrule that. I will allow that.

[APPELLEE'S COUNSEL]: Read the introduction, sir.

THE COURT: For reasons previously stated, you have got a continuing objection.

MR. WILLITS: The first paragraph?

[APPELLEE'S COUNSEL]: Yes[sic] sir. "Per your instructions[.]"[sic]

MR. WILLITS: "Per your instructions we have undertaken an analysis of the Nursing Center Management Agreement entered on June 27[,][sic] 1994 by and between Elkton Care Center Associates Limited Partnership[,][sic] owner[,][sic] and Quality Care Management Company[,][sic] Inc.[,][sic] QCM[,][sic] pursuant to which QCM was engaged to mange and operated Medpointe. The purpose of this analysis was to determine what should be the owner's strategy in preparing for defense of a possible lawsuit against it by QCM on account of the early termination of the agreement by the owner."

[APPELLEE'S COUNSEL]: So does this refresh your recollection that preparing a strategy for defense was part of the engagement of the law firm as well as giving you the opinion on termination?

MR. WILLITS: That's what that said.

[APPELLANT'S COUNSEL]: Objection.

THE COURT: Overruled.

As stated above, the jury concluded that appellant had breached the contract.

### The Consequences of Inadvertent Disclosure

█ Appellant argues that the attorney-client privilege [1] and/or work product privilege was not waived by the inadvertent disclosure that occurred during document production in the case at bar. The attorney-client privilege and the work product doctrine are separate and distinct. *E.I. du Pont de Nemours & Co. v. Forma–Pack, Inc.*, 351 Md. 396, 406, 718 A.2d 1129 (1998). For purposes of this appeal, however, whether inadvertent disclosure constituted a waiver does not depend upon which privilege is asserted. "When the disclosure is made to the adverse party, . . . the distinction between waiver of attorney client privilege and of work product immunity disappears." *Hartford Fire Insurance v. Garvey*, 109 F.R.D. 323, 328 (N.D.Cal.1985).

Neither the Court of Appeals nor this Court has decided the issue of whether the attorney-client privilege is waived by the inadvertent disclosure of a document protected by that privilege.[2] Dean Wigmore took the position that *any* disclosure

---

**1.** The attorney-client privilege is " 'the oldest of the privileges for confidential communications known to the common law.' " *E.I. du Pont de Nemours & Co. v. Forma–Pack, Inc.*, 351 Md. 396, 414, 718 A.2d 1129 (1998)(citing *Upjohn Co. v. United States*, 449 U.S. 383, 389, 101 S.Ct. 677, 66 L.Ed.2d 584 (1981)). *See also Harrison v. State*, 276 Md. 122, 131, 345 A.2d 830 (1975)(explaining that the privilege extends at least as far back as the reign of Elizabeth I (1558–1603)). Generally, the attorney-client privilege bars compelled disclosure, without the client's consent, of attorney-client communications made in confidence between the attorney and client. *See In re Criminal Investigation No. 1/242Q*, 326 Md. 1, 5, 602 A.2d 1220 (1992); *State v. Pratt*, 284 Md. 516, 519, 398 A.2d 421 (1979); *Harrison*, 276 Md. at 133–34, 345 A.2d 830. It is codified in Maryland Code (1974, 1998 Repl.Vol.), Courts and Judicial Proceeding Article § 9–108, which provides that "[a] person may not be compelled to testify in violation of the attorney-client privilege." The privilege is grounded in the public policy of encouraging a client to consult freely with and seek legal advice from an attorney without fear of the attorney being forced to testify or produce evidence as to the confidences in various judicial or other proceedings. *See In re Criminal Investigation No. 1/242Q*, 326 Md. at 5, 602 A.2d 1220; *Pratt*, 284 Md. at 520, 398 A.2d 421; *Harrison*, 276 Md. at 134, 345 A.2d 830.

**2.** For an extensive discussion of inadvertent disclosure and the attorney-client privilege, *see* Roberta Harding, *Waiver: A Comprehensive*

causes a loss of protection. *See* 8 Wigmore, Evidence § 2325 at 633 (McNaughton rev.1961). Following Wigmore, some courts have adopted the "strict test" or "waiver" test, under which an inadvertent disclosure constitutes a waiver of the privilege.[3] Some courts have adopted the "lenient" or "no waiver" test, under which the attorney's negligence cannot waive the privilege because the client, and not the attorney, is the holder of the privilege.[4] Professors Mueller and Kirkpatrick have criticized these inflexible positions:

Courts are divided on whether the attorney-client privilege is lost by accidental or inadvertent disclosure. Usually inadvertent or accidental disclosure happens when a privileged document is released during discovery, and in this setting there are three primary views on the question whether privilege protection continues. Modern courts generally reject Wigmore's wooden and mechanical view that any unprivileged disclosure waives the privilege, but some modern courts take a pretty strict position on this point. They hold that the privilege is waived by any unprivileged disclosure that is voluntary, even though made inadvertently and without intent to waive. A second view is very nearly at the opposite end of the spectrum, and it holds that the privilege is waived only where the disclosing party actually intended to waive it.

A third intermediate view sensibly holds that the question whether disclosure during discovery results in loss of privilege protection depends very much on the circumstances, and the issue should be resolved by looking mostly to three factors: First is the degree of care apparently exercised by

---

*Analysis of a Consequence of Inadvertently Producing Documents Protected by the Attorney–Client Privilege*, 42 Cath. U.L.Rev. 465 (1993).

**3.** *Carter v. Gibbs*, 909 F.2d 1452, 1458 (Fed.Cir.), *cert denied*, 498 U.S. 811, 111 S.Ct. 46, 112 L.Ed.2d 22 (1990); *In re Sealed Case*, 877 F.2d 976, 980 (D.C.Cir.1989).

**4.** *Georgetown Manor v. Ethan Allen, Inc.*, 753 F.Supp. 936, 938 (S.D.Fla.1991); *Mendenhall v. Barber–Greene Co.*, 531 F.Supp. 951, 954 (D.C.Ill.1982).

the claimant. Second is the presence of extenuating circumstances, the most obvious being the press of massive discovery going forward under the pressure of deadlines, where even caution in producing documents is likely to generate occasional mistakes. Third is the behavior of the privilege claimant in taking remedial steps after disclosing material. Christopher B. Mueller & Laird C. Kirkpatrick, *Evidence*, § 5.29 at 450–52 (4th ed.1995) (footnotes omitted).

■ We agree with Professors Mueller and Kirkpatrick, and with those courts that have adopted an "intermediate" (or "middle") test, under which the court makes a fact specific case-by-case analysis to determine whether the privilege has been waived.[5] The courts that use this approach examine the following factors: "(1) the reasonableness of the precautions taken to prevent inadvertent disclosure in view of the extent of the document production; (2) the number of inadvertent disclosures; (3) the extent of the disclosure; (4) any delay and measures taken to rectify the disclosure; and (5) whether the overriding interests of justice would or would not be served by relieving a party of its error." *See Sampson Fire Sales v. Oaks,* 201 F.R.D., 351, 360 (M.D.Pa.2001).

■ We are persuaded that neither the lenient test nor the strict test is as fair as the intermediate test,[6] and that the intermediate test is consistent with Court of Appeals' precedent.

The attorney-client privilege is not absolute and "is not an inviolable seal upon the attorney's lips." *Pitney–Bowes, Inc. v. Mestre,* 86 F.R.D. 444, 446 (S.D.Fl.1980)(citing *Laughner v. U.S.,* 373 F.2d 326, 327 (5th Cir.1967)). Invo-

---

**5.** *See Ciba–Geigy Corp. v. Sandoz, Ltd.,* 916 F.Supp. 404, 410–11 (D.N.J. 1995); *Alldread v. City of Grenada,* 988 F.2d 1425, 1433–34 (5th Cir.1993); *Amgen v. Hoechst Marion Roussel, Inc.,* 190 F.R.D. 287, 292 (D.Mass.2000); *Edwards v. Whitaker,* 868 F.Supp. 226, 229 (M.D.Tenn. 1994).

**6.** The lenient test does not provide any incentive for attorneys to take adequate steps to protect privileged documents. The strict test does not allow for appropriate pre-trial remedies that would preserve the privilege without causing any unfair prejudice.

cation of the privilege can create evidentiary inequities between parties during discovery and the absence of fact and truth at trial. "Because the application of the attorney-client privilege withholds relevant information from the fact finder, the privilege contains some limitations and should be narrowly construed." *E.I. du Pont de Nemours & Co.*, 351 Md. at 415, 718 A.2d 1129. Only the client has the power to waive the attorney-client privilege. *See City of College Park v. Cotter*, 309 Md. 573, 591, 525 A.2d 1059 (1987). Nonetheless, express and implied waivers of the privilege are universally recognized limitations on client power to hold the privilege. *See Harrison*, 276 Md. at 137–38, 345 A.2d 830.

*Parler & Wobber v. Miles & Stockbridge*, 359 Md. 671, 690–92, 756 A.2d 526 (2000)(parallel citations omitted). Applying the intermediate test to the facts of this case, in which the inadvertent disclosure occurred during pre-trial discovery, but was not brought to Judge Thompson's attention until (in the words of appellant's brief) "the penultimate day of trial," we conclude that the inadvertent disclosure constituted a waiver.

In most inadvertent disclosure cases, at least one factor is closely related to another factor. The case at bar is no exception. Factors one, two and three—*the reasonableness of precautions taken to prevent inadvertent disclosure, the number of inadvertent disclosures,* and *the extent of the disclosure*—all strongly favor waiver. Here, the privileged document was inadvertently included in a half-full box of documents produced by a lawyer who was then representing appellant. Appellee's counsel tabbed that document, along with others, and returned all of the tabbed documents to the lawyer then representing appellant, who arranged to have the tabbed documents copied and delivered to appellee's counsel. Thus, on two occasions during the pretrial discovery phase of this case, counsel then representing appellant had the opportunity to assert the attorney-client privilege with respect to the memorandum at issue.[7] This is not a case in which

---

7. Although the words "ATTORNEY/CLIENT PRIVILEGE ATTORNEY WORK PRODUCT PREPARED IN ANTICIPATION OF LITIGATION"

hundreds of boxes and/or thousands of documents were produced.

Factor four, *any delay and measures taken to rectify the disclosure,* also strongly favors waiver. Had this issue been brought to Judge Thompson's attention prior to trial, (1) Judge Thompson could have entered an *in limine* order that would have prohibited appellee's counsel from making any use of the memorandum unless and until appellant introduced evidence that "opened the door" to its use,[8] and (2) appellant's defense would have focused on its right to terminate the contract rather than on its reasons for doing so.[9] In light of Mr. Willits' direct examination, factor five, *whether the overriding interests of justice would or would not be served by relieving the party of its error,* also strongly favors waiver. The inadvertent disclosure in the case at bar constitutes a waiver of the attorney-client and attorney work product privileges.[10]

---

are prominently displayed on the memorandum, appellant concedes that appellee's counsel did nothing improper or unethical in "tabbing" the memorandum.

8. In *White v. State,* 56 Md.App. 265, 467 A.2d 771 (1983), this Court recognized "a principle of admissibility under which evidence that is irrelevant or otherwise incomplete may be allowed to be answered to correct a prejudicially misleading impression left by the introduction of misleading evidence.... [O]ne who induces a trial court to let down the bars to a field of inquiry that is not competent or relevant to the issues cannot complain if his adversary is allowed to avail himself of the opening." *Id.* at 273, 467 A.2d 771.

9. Because the question of whether Medpointe was entitled to terminate the contract is an objective one, Mr. Willits' "personal feelings are irrelevant to the issue of [Medpointe's right to terminate]." *Goodwich v. Sinai Hospital,* 103 Md.App. 341, 352, 653 A.2d 541 (1995), *affd,* 343 Md. 185, 680 A.2d 1067 (1996). When a contract provides that termination is a remedy for a party's breach, the party who has breached does not have the right to defend against termination on the ground that "the terminating party had a subjective motivation of animosity or reprisal towards the breaching party." *Shaklee U.S. Inc. v. Giddens,* 934 F.2d 324, 1991 WL 90003, 1991 U.S.App. Lexis 17061, n. 1.

10. Since we have concluded that appellant's inadvertent disclosure constituted a waiver, the "harmless error" issue is moot, as is appellee's

### *Introduction of the Memorandum has a Waiver of Appellant's objection*

■   Appellee argues that appellant waived its objection by introducing the entire memorandum into evidence. We disagree. In *Mayor and City Council of Baltimore v. Smulyan,* 41 Md.App. 202, 397 A.2d 198 (1979), this Court rejected the contention that responding to evidence admitted over objection constitutes a waiver of the objection.

> We do not, and, of course, may not, depart from the oft-stated rule that an objection to evidence may be deemed waived if the same evidence is permitted to come in subsequently without objection. *See, for example, State Roads Comm. v. Bare,* 220 Md. 91, 151 A.2d 154 (1959). However, there are some practical limits to what counsel must do, or refrain from doing, in order to preserve the objection. When a party makes a clear objection to specific evidence and that objection is plainly overruled, he is not required to play the ostrich and simply ignore the evidence, or its potential effect upon his case, for fear of losing his ground for appeal. He may cross-examine (or, in this instance, redirectly examine) the witness about the evidence, *Peisner v. State,* 236 Md. 137, 144, 202 A.2d 585 (1964), and make other reasonable efforts to show that the evidence, admitted over his objection, should nevertheless be discounted or disregarded by the trier of fact.

*Id.* at 219, 397 A.2d 198. In the case at bar, appellant's counsel objected on nine separate occasions and was granted a continuing objection. After appellee's counsel cross-examined Mr. Willits about the negative portions of the memorandum, appellant's counsel elected to introduce the entire memorandum into evidence. Under these circumstances, in which it is

---

argument that appellant has failed to make a foundational showing that the disclosure was inadvertent. While it is true that appellant's trial counsel should have supplied Judge Thompson with an on-the-record explanation of precisely how the memorandum was inadvertently disclosed, Judge Thompson was not clearly erroneous in finding that this case involved the inadvertent disclosure of an otherwise privileged document.

clear that appellant's trial counsel introduced the memorandum in an attempt to counter the impact caused by appellee's use of the memorandum, appellant did not waive its objection to appellee's use of the memorandum during the cross-examination of Mr. Willits.

**JUDGMENT AFFIRMED;**

**COSTS TO BE PAID BY APPELLANT.**