[No. 36218-0-II.   Division Two.   November 25, 2008.]

DAVID B. SITTERSON, *Appellant*, v. EVERGREEN SCHOOL DISTRICT No. 114, *Respondent*.

*Steven E. Turner* (of *Miller Nash, LLP*), for appellant.

*Bruce M. White*; and *Todd S. Baran* (of *Todd S. Baran, PC*), for respondent.

¶1 ARMSTRONG, J. — The Evergreen School District No. 114 (District) hired David B. Sitterson as a financial adviser to help it raise money by selling bonds. Six months before issuing $59 million of bonds, the District attempted to terminate Sitterson's contract to avoid paying his commission of $111,250. Sitterson sued the District for breach of contract and quantum meruit, and the jury awarded him $151,000. He now appeals the trial court's denial of prejudgment interest on $111,250 of the award, arguing that this amount represents his liquidated damages and is "included" in the jury's award. In a cross appeal, the District challenges the trial court's admission of four attorney-client letters into evidence, arguing that it did not waive the attorney-client privilege by disclosing the documents to Sitterson in discovery. We find no error and, thus, affirm.

## FACTS

A. Background Facts

¶2 Sitterson is a financial adviser who advises school districts in the approval and sale of bonds. In 1997, he responded to a request for proposal from the District seeking such a financial adviser. The proposal allowed for a three-year contract, which "may be extended for two additional years, if mutually agreed." Ex. 6, at 8. After the District awarded Sitterson the contract, he negotiated compensation with John Nissen, the District's director of budget and fiscal services. The District agreed to pay Sitterson a commission of $3.00 per $1,000.00 for the first $15 million of debt issued, $2.00 per $1,000.00 for the next $15 million issued, and $1.25 per $1,000.00 for any additional amounts.

¶3 In 1999, Sitterson assisted the District in obtaining voter approval for and selling $58.5 million in general obligation bonds. The District paid Sitterson $110,625 according to the negotiated formula. At the time, the District's assistant superintendent, Marcia Fromhold,[1] expressed concern to Nissen about the amount of Sitterson's fees.

¶4 Two years later, the District considered whether to renew Sitterson's contract or hire someone else "that might be cheaper." Ex. 37. It ultimately decided to renew Sitterson's contract. Accordingly, the District's purchasing agent, Connie Bosckis, wrote Sitterson, offering to extend the contract "for the contract period February 24, 2001 through February 1, 2003." Ex. 38. Sitterson accepted the extension and believed that the contract would run for another two years.

¶5 A few months after renewing the contract, Sitterson met with and advised the District about its options in issuing more bonds. He then worked with an underwriter to run financial projections for each option. In November 2001, Sitterson recommended to the District that it seek voter approval for the total capital-needs budget, around $160 million, all at once instead of in successive ballot measures. According to Sitterson, the school board approved the idea.

¶6 On January 28, 2002, Fromhold summoned Sitterson to her office. Sitterson testified that she told him the District was terminating his contract and "muttered under her breath, but loud enough for [him] to hear, 'It's just so much money.'" 2 Report of Proceedings (RP) at 200. Fromhold testified that she told Sitterson the District was not going to renew his contract for the second extension year, partly because his services were too expensive.

¶7 In March 2002, the District placed a request for a $167,930,000 bond on the ballot. The voters approved the measure, and the District sold $59 million in bonds in July

---

[1] Marcia Fromhold is occasionally referred to in the record as Marcia Ross. We refer to her as Fromhold.

2002. Under the parties' contract, the District would have owed Sitterson a $111,250 commission on the bond sale. Sitterson sued the District for breach of contract and quantum meruit (unjust enrichment).

B. Attorney-Client Privileged Exhibits

¶8 About one month after filing his complaint, Sitterson served a request for production of documents on the District. The District provided approximately 439 pages of documents in response, including four confidential letters between the District and its attorney, Brian Wolfe, about the prospective or pending litigation with Sitterson.

¶9 Three years later and 10 days before the trial date, Sitterson sent copies of his proposed exhibits to the District, including the four letters as exhibits 55, 59, 62, and 64. The District objected to admission of those exhibits on the first day of trial, arguing that they were protected by the attorney-client privilege. Wolfe, still representing the District, explained his disclosure:

> I suspect that we -- we provided them to Mr. Turner in the discovery because, you know, you have -- you're supposed to provide everything that may lead to admissible evidence. But just because you provide it doesn't mean that it is admissible evidence.

1B RP at 1048. Sitterson responded that the District waived the privilege when it produced the documents during discovery. The court asked Wolfe, "[W]hat role did you have in the release of these documents? I mean, did they not go through you[?]" 1B RP at 1065. Wolfe responded, "They did. And I just didn't -- I guess I wasn't thorough enough." 1B RP at 1065. The court denied the District's motion to exclude.

¶10 During Sitterson's opening statement, his counsel spoke extensively about exhibits 55 and 59, both letters from Wolfe to the District analyzing the merits of the case. Counsel read aloud portions of exhibit 55 in which Wolfe stated his initial analysis of the case after reviewing the

relevant contracts and other documents. Counsel then summarized that analysis as follows:

> So what Mr. Wolfe is saying to the district is, in fact, even though Connie Bosckis sent Mr. Sitterson a letter and said, We want to renew the contract through February 1st of 2003, pick up the two-year option; and even though Mr. Sitterson saw that, reviewed it, signed it and sent it back, Mr. Wolfe's analysis was that because Ms. Bosckis didn't have the authority to do two years, that, in fact, it was only a one-year contract.
>
> But what's notable about this is this is July 13th of 2003, and this is the first document you will ever see in this entire case that suggests that Ms. Bosckis was *not doing anything other than what her bosses told her to do* when they said renew the contract with Mr. Sitterson.

1A RP at 75-76. Sitterson's attorney also read from and discussed Wolfe's follow-up letter. In this letter, Wolfe described Bosckis's renewal letter as "our weak link" because if Sitterson did work in reliance on the letter's renewal for two years, "the district's position would not pass the smell test." 1A RP at 77-78. After reading this language, Sitterson's counsel told the jury:

> Well, that exactly -- is exactly what happened in this case, Mr. Sitterson did rely on the letter from Ms. Bosckis. Why wouldn't he? He did put in some work effort. He did work for an entire year under that contract and didn't receive any money for the work that he did for that 2002 bond, all the recommendations that he made, the meetings he attended to, the ideas that he gave them.

1A RP at 78. During his closing argument, counsel again read the same portions of exhibits 55 and 59 to the jury, highlighting the "would not pass the smell test" language. 4B RP at 873.

C. Damages

¶11 The trial court instructed the jury on how to calculate damages for both the contract and the quantum meruit claims. During Sitterson's closing argument, his counsel

calculated the amount due under the contract as $111,250 and asked the jury to award that amount. He did not argue as to the amount of damages Sitterson was seeking under the quantum meruit claim.

¶12 During its deliberations, the jury submitted the following question to the court: "Under instruction 24 what, if any, latitude do we have to adjust the sum of money up or down?" Clerk's Papers (CP) at 191. Instruction 24 concerned how to measure "actual damages" on the breach of contract claim. CP at 176. The court answered the question, "That is a decision for the jury." CP at 191. The jury returned a general verdict of $151,000.

¶13 Sitterson moved for prejudgment interest on $111,250 of the award, arguing that that amount represented liquidated damages and the remaining $39,750 was unliquidated damages. The trial court denied the motion, explaining that it was impossible to determine whether the award included liquidated amounts because the court had not asked the jury to state in a special interrogatory whether it was awarding damages on the contract claim or the quantum meruit claim.

## ANALYSIS

### ATTORNEY-CLIENT PRIVILEGE

¶14 The District argues in its cross appeal that the trial court erred in admitting exhibits 55, 59, 62, and 64 because it had not waived its attorney-client privilege by producing them to Sitterson in discovery. Both parties phrase the legal issue as whether an "inadvertent" disclosure of privileged documents waives the privilege, and they both acknowledge that Washington law has not addressed the question. The District urges us to hold that inadvertent disclosure of privileged documents *never* results in waiver. Sitterson argues that we should adopt a "balanced approach" to inadvertent disclosure in which the court considers several factors, including (1) the reasonableness of precautions

taken to prevent disclosure, (2) the amount of time taken to remedy the error, (3) the scope of discovery, (4) the extent of the disclosure, and (5) the overriding issue of fairness. Reply Br. of Appellant at 23.

¶15 RCW 5.60.060(2)(a) provides that "[a]n attorney or counselor shall not, without the consent of his or her client, be examined as to any communication made by the client to him or her, or his or her advice given thereon in the course of professional employment." *Dietz v. John Doe*, 131 Wn.2d 835, 842, 935 P.2d 611 (1997). The attorney-client privilege allows the client to communicate freely with an attorney without fear of compulsory discovery. *Soter v. Cowles Publ'g Co.*, 162 Wn.2d 716, 745, 174 P.3d 60 (2007) (citing *Dietz*, 131 Wn.2d at 842). It applies to all communications and advice between an attorney and client, including documents that contain privileged communications. *Soter*, 162 Wn.2d at 745 (quoting *Dietz*, 131 Wn.2d at 842). The attorney-client privilege can be waived. *Dietz*, 131 Wn.2d at 849-50 (quoting 8 JOHN HENRY WIGMORE, EVIDENCE IN TRIALS AT COMMON LAW § 2292, at 554 (McNaughton rev. ed. 1961)); *State ex rel. Sowers v. Olwell*, 64 Wn.2d 828, 833, 394 P.2d 681 (1964).

A. Who May Waive

¶16 The District argues first that only the client can waive the privilege. Ordinarily this is true because it is the client to whom the privilege belongs. *Dietz*, 131 Wn.2d at 850. But, an attorney can waive the privilege if he or she is authorized to speak and act for the client on particular matters and discloses privileged material within the scope of that authority. *Dietz*, 131 Wn.2d at 850 (quoting PAUL R. RICE, ATTORNEY-CLIENT PRIVILEGE IN THE UNITED STATES § 11:10, at 978-81 (1993)).

¶17 Answering discovery requests is generally a matter in which the attorney has authority to speak and act for the client. Indeed, as Professor Rice stated, "In pretrial settings, . . . the implied authority of counsel is often so necessary and apparent that the burden will be imposed on

the client to demonstrate that the attorney was *not* authorized to claim and waive the privilege." PAUL R. RICE, ATTORNEY-CLIENT PRIVILEGE IN THE UNITED STATES § 9.10, at 9-28 (2d ed. 2007). We hold that Wolfe acted within the scope of his authority when he produced the documents to Sitterson and that his production could therefore waive the District's privilege.

## B. "Inadvertent" Disclosure

¶18 The traditional approach to waiver of the attorney-client privilege by voluntary disclosure is that all such disclosures (oral or written) made to the opposing party in the course of taking adverse steps in litigation are "receivable as being made under an implied waiver of privilege." 8 WIGMORE, *supra*, § 2325, at 633; *see also* 5A KARL B. TEGLAND, WASHINGTON PRACTICE: EVIDENCE LAW & PRACTICE § 501.23, at 175 & n.22 (5th ed. 2007). Washington follows this rule for *deliberate* disclosures of privileged documents in discovery. 5A TEGLAND, *supra*, § 501.23, at 174. But the traditional approach infers waiver even where the attorney did not necessarily intend that result. 8 WIGMORE, *supra*, § 2327, at 636; Richard L. Marcus, *The Perils of Privilege: Waiver and the Litigator*, 84 MICH. L. REV. 1605 (1986) ("courts adopting a nineteenth-century attitude are likely to hold that any disclosure of privileged material waives the privilege"). The rule consequently creates a very strong incentive for attorneys to protect their clients' confidential communications.

¶19 More recently, many courts have been more flexible in analyzing waiver because of "the scope of modern discovery and the realities of contemporary litigation." 1 MCCORMICK ON EVIDENCE § 93, at 372 (John W. Strong ed., 5th ed. 1999). Specifically, such courts have expressed concern that the "enormous quantities of documents . . . sought by an opponent through discovery" in modern litigation creates an impossible burden on attorneys to attempt to avoid inadvertent disclosure, the consequences of which are "potentially staggering." 1 MCCORMICK ON EVIDENCE, *supra*, § 93, at 372. Commentators have noted that "[u]nder current

conditions, some privileged material is likely to pass through even the most tightly woven screen." 1 McCormick on Evidence, *supra,* § 93, at 372. In this context, several courts have adopted new approaches to waiver, but Washington has not yet done so. *See* 5A Tegland, *supra,* § 501.23, at 174-76.

## 1. Inadvertence

■ ¶20  Although the parties do not discuss it, a preliminary question is whether the District's disclosure was in fact inadvertent. The record does not support a conclusion that it was. In fact, Wolfe initially told the court that he had deliberately given Sitterson the letters under the mistaken belief that the discovery rules required him to do so. Although counsel later stated that he guessed he "wasn't thorough enough," the comment is ambiguous as to whether he was not thorough enough in screening the materials or in learning what the law required him to disclose. And the District, as the party asserting the privilege, has the burden of proving that it applies. *VersusLaw, Inc. v. Stoel Rives, LLP,* 127 Wn. App. 309, 332, 111 P.3d 866 (2005), *review denied,* 156 Wn.2d 1008 (2006). Still, neither party asked the trial court to specifically find whether the waiver was inadvertent or intentional. Instead, they argued to the trial court, as they do to us, that the disclosure was inadvertent. Accordingly, we address the issue with the same assumption.

## 2. Legal Standard

¶21  The parties rely on federal cases[2] in which courts follow three distinct approaches: (1) the traditional "abso-

---

[2] Sitterson asserts that we should rely on federal authority because "Washington's privilege rules . . . are patterned after the federal rules." Reply Br. of Appellant at 6. He provides no citation to authority for this proposition, and it appears that the opposite is the case. *See State v. Darden,* 145 Wn.2d 612, 627, 41 P.3d 1189 (2002) (refusing to adopt a new privilege under ER 501 that was accepted by federal courts under Fed. R. Evid. 501 because federal rule is "entirely different" from Washington rule).

lute waiver" approach discussed above;[3] (2) the absolute "no waiver" approach;[4] and (3) the "balanced" approach.[5] Reply Br. of Appellant at 7, 10, 15. Because neither party advocates an "absolute waiver" rule, we discuss only whether we should hold that (1) an inadvertent production never waives the privilege or (2) an inadvertent production can waive the privilege depending on the circumstances of the case, particularly those surrounding the production.

### a. Nonwaiver Rule

■■ ¶22 The District urges us to hold that inadvertent disclosure of privileged documents never results in waiver. It cites general principles of waiver that are used in other contexts, including that a waiver must be "knowing and voluntary"[6] and "distinct and unequivocal."[7] Br. of Resp't at 17. The District also argues that a no-waiver rule is most consistent with the purpose of the privilege because "[a] client's candor with counsel would be chilled if mere inadvertence by counsel could result in loss of the communication privilege." Br. of Resp't at 16.

¶23 We are not persuaded. First, the rule does not support the purpose of the attorney-client privilege, which is to allow free and safe communication between client and attorney by keeping those communications confidential. *Soter*, 162 Wn.2d at 745. While the no-waiver rule may

---

[3] *See In re Sealed Case*, 278 U.S. App. D.C. 8, 877 F.2d 976, 980 (1989); *In re Grand Jury Proceedings*, 727 F.2d 1352, 1356 (4th Cir. 1984); *Underwater Storage, Inc. v. U.S. Rubber Co.*, 314 F. Supp. 546, 549 (D.D.C. 1970); *Int'l Digital Sys. Corp. v. Digital Equip. Corp.*, 120 F.R.D. 445, 449-50 (D. Mass. 1988).

[4] *See Georgetown Manor, Inc. v. Ethan Allen, Inc.*, 753 F. Supp. 936, 938 (S.D. Fla. 1991); *Mendenhall v. Barber-Greene Co.*, 531 F. Supp. 951, 954 (N.D. Ill. 1982).

[5] *See Alldread v. City of Grenada*, 988 F.2d 1425, 1433 (5th Cir. 1993); *Amgen Inc. v. Hoechst Marion Roussel, Inc.*, 190 F.R.D. 287, 292 (D. Mass. 2000); *United States v. Pepper's Steel & Alloys, Inc.*, 742 F. Supp. 641, 643-45 (S.D. Fla. 1990).

[6] This rule is from a case dealing with waiver of a contract right. *Pub. Util. Dist. No. 1 of Lewis County v. Wash. Pub. Power Supply Sys.*, 104 Wn.2d 353, 364-65, 705 P.2d 1195, 713 P.2d 1109 (1985).

[7] This rule is from a case dealing with the physician-patient privilege. *Packard v. Coberly*, 147 Wash. 345, 348-49, 265 P. 1082 (1928).

prevent privileged information from being admitted as evidence, it decreases incentives for attorneys to guard the confidentiality of their communications in the first place. Yet once those communications are revealed, the privilege is left "with no legitimate function to perform." 1 McCormick on Evidence, *supra*, § 93, at 371-72; *see Underwater Storage, Inc. v. U.S. Rubber Co.*, 314 F. Supp. 546, 549 (D.D.C. 1970) (Once a document was inadvertently produced for inspection, it "entered the public domain. Its confidentiality was breached[,] thereby destroying the basis for the continued existence of the privilege."). Because of this unique attribute of the attorney-client privilege, the waiver principles the District cites are not fitting.

¶24 Second, the no-waiver rule is inconsistent with Washington's policy of strictly limiting the attorney-client privilege to its purpose. *Dietz*, 131 Wn.2d at 843; *Pappas v. Holloway*, 114 Wn.2d 198, 204, 787 P.2d 30 (1990). The privilege is so limited because it sometimes results in the exclusion of relevant and material evidence, contrary to the philosophy that justice requires the fullest disclosure of the facts. *Dietz*, 131 Wn.2d at 843. Consequently, "[e]mploying the attorney-client privilege to prohibit testimony must be balanced against the benefits to the administration of justice stemming from the general duty to 'give what testimony one is capable of giving.' " *Dietz*, 131 Wn.2d at 843 (quoting *United States v. Bryan*, 339 U.S. 323, 331, 70 S. Ct. 724, 94 L. Ed. 884 (1950)). These considerations weigh toward taking a broader view of waiver than the District proposes.

b. The "Balanced" Approach

¶25 According to commentators, decisions in other jurisdictions are tending toward a more "balanced" approach to waiver of the attorney-client privilege. 1 McCormick on Evidence, *supra*, § 93, at 373; *see, e.g., Harp v. King*, 266 Conn. 747, 768-69, 835 A.2d 953 (2003); *Save Sunset Beach Coal. v. City & County of Honolulu*, 102 Haw. 465, 486, 78 P.3d 1 (2003); *Elkton Care Ctr. Assocs. Ltd. P'ship v. Quality*

*Care Mgmt., Inc.*, 145 Md. App. 532, 545, 805 A.2d 1177 (2002). One such decision, *Alldread v. City of Grenada*, 988 F.2d 1425 (5th Cir. 1993), adopted a five-part test under which courts consider the circumstances surrounding the disclosure. These factors are (1) the reasonableness of precautions taken to prevent disclosure, (2) the amount of time taken to remedy the error, (3) the scope of discovery, (4) the extent of the disclosure, and (5) the overriding issue of fairness. *Alldread*, 988 F.2d at 1433.

¶26 The *Alldread* balanced approach is flexible, taking into account both the principles underlying the attorney-client privilege and the realities of modern litigation. The approach will continue to provide incentives for attorneys to protect confidential communications with their clients, but it also recognizes that truly unpreventable and inadvertent disclosures occur at great costs to the client's interests. Because of these considerations, Congress recently amended the federal rules of evidence to reflect a balanced approach to inadvertent waiver of the attorney-client privilege.[8] Pub. L. No. 110-322, § 1, 122 Stat. 3537 (2008). We are similarly persuaded and hereby adopt the *Alldread* balanced approach to determine whether the District's inadvertent disclosures waived the attorney-client privilege. *See also Harris v. Drake*, 152 Wn.2d 480, 495, 99 P.3d 872 (2004) (Alexander, C.J., dissenting).

¶27 The *Alldread* factors lead us to conclude that the District waived its privilege in exhibits 55, 59, 62, and 64. First, counsel for the District offered no evidence of any precautions he or his office took to prevent the disclosures. Second, the District did not notice or attempt to remedy the error until three years after it was made. *Cf. In re*

---

[8] As of September 19, 2008, Fed. R. Evid. 502(b) provides that a disclosure made in a federal proceeding does not operate as a waiver if

(1) the disclosure is inadvertent;

(2) the holder of the privilege or protection took reasonable steps to prevent disclosure; and

(3) the holder promptly took reasonable steps to rectify the error, including (if applicable) following Federal Rule of Civil Procedure 26(b)(5)(B).

*Grand Jury Investigation of Ocean Transp.*, 196 U.S. App. D.C. 8, 604 F.2d 672, 675 (1979) (Where documents were turned over one year prior to the assertion of privilege, and they had already been copied, digested, and analyzed by the time of the motion, the court found that "the disclosure cannot be cured simply by a return of the documents. The privilege has been permanently destroyed."). Third, the District produced 439 documents in response to Sitterson's request for production. This is not the "enormous" quantity of documents that would excuse an inadvertent production of privileged documents. Finally, the issue of fairness favors neither the District nor Sitterson; the District clearly slept on its rights to object to the disclosure, and Sitterson used the documents only to discredit defense counsel at trial. Further, the letters at issue dealt only with counsel's analysis of Sitterson's contract claim, specifically whether Sitterson's contract had been extended for one year or two. But the jury apparently awarded damages on the quantum meruit claim, not the contract claim. Thus, we cannot find that counsel's admissions on the contract claim unfairly prejudiced the District.

¶28 We hold that the District waived its attorney-client privilege in the letters. The trial court did not abuse its discretion in admitting them into evidence.

¶29 A majority of the panel having determined that only the foregoing portion of this opinion will be printed in the Washington Appellate Reports and that the remainder shall be filed for public record pursuant to RCW 2.06.040, it is so ordered.

HOUGHTON and BRIDGEWATER, JJ., concur.