174 P.3d 60 (2007)
Cody SOTER, a minor child; Francis Soter and Glenda Carr, individually, and as parents of Cody Soter; the Estate of Nathan Walters, a deceased minor child; Rick Walters and Teresa Walters, individually, and as parents of Nathan Walters, a deceased minor child, Plaintiffs,
Spokane School District No. 81, a Washington Municipal Corporation, Respondent,
v.
COWLES PUBLISHING COMPANY, a Washington corporation, Petitioner.
No. 78574-1.
Supreme Court of Washington, En Banc.
Argued March 20, 2007.
Decided December 27, 2007.
*64 Duane Michael Swinton, Spokane, WA, Tracy N. Leroy, Baker Botts LLP, Houston, TX, for Petitioner.
Paul Eric Clay, John Alfred Manix, Stevens Clay & Manix PS, Brian E. Kistler, Spokane, WA, for Respondent.
Milton G. Rowland, Foster Pepper PLLC, Spokane, WA, Daniel Brian Heid, City of Auburn, Auburn, WA, Amicus Curiae on behalf of Washington State Association of Municipal Attorneys.
Michele Lynn Earl-Hubbard, Allied Law Group, LLC, Minh P. Ngo, Davis Wright Tremaine LLP, Seattle, WA, Amicus Curiae on behalf of Washington Coalition for Open Government.
Grace Tsuang Yuan, Denise L. Stiffarm, Laura Kristine Clinton, Kirkpatrick & Lockhart Preston Gates Ell, Seattle, WA, Amicus Curiae on behalf of Washington Schools Risk Management Pool, The Washington Association of School Administrators, The Washington Council of School Attorneys, The Southwest Washington Risk Management Insurance Cooperative, The Washington Governmental Entity Pool.
Michele Lynn Earl-Hubbard, Allied Law Group, LLC, Seattle, WA, Amicus Curiae on behalf of Allied Daily Newspapers of Washington, Washington Newspaper Publishers Association.
BRIDGE, J.
¶ 1 Nine-year-old Nathan Walters died after ingesting part of a peanut butter cookie, which was served to him in a school lunch on a school field trip. The school district had been aware that Nathan was severely allergic to peanuts, but it did not provide him with a special lunch, nor did school personnel administer epinephrine soon enough to prevent his death. The school district undertook an investigation, Nathan's parents gave notice of their intention to file a wrongful death claim against the school district, and the parties mediated and settled the claim.
¶ 2 Just before mediation began, a reporter from The Spokesman-Review requested all of the school district's documents relating to Nathan's death pursuant to the Public Records Act, chapter 42.56 RCW. The school district refused to produce 75 records on the grounds that the records were exempt from public disclosure based on attorney-client privilege and the attorney work product doctrine, both recognized exceptions to the Public Records Act's disclosure requirements. We conclude that the vast majority of the documents at issue here are protected from disclosure because they are handwritten notes or memoranda about witness interviews created by the legal team, making them protected work product. Three additional documents are protected work product created by the legal team, even though they are not handwritten notes from witness interviews. The remaining documents involve privileged communications between the attorneys and their clients.[1]
*65 ¶ 3 The parties have also asked us to determine whether an agency can petition for a judicial determination that records are exempt from disclosure. We conclude that pursuant to RCW 42.56.540, a state or local government entity can seek judgment in superior court as to whether a particular record is subject to disclosure under the Public Records Act.

I

Facts and Procedural History
¶ 4 Nathan Walters transferred to Logan Elementary School in the Spokane School District in the spring of 2001. At that time, school district personnel and Nathan's family communicated about Nathan's medical conditions, which included asthma and a severe allergy to peanuts.
¶ 5 On Friday May 18, 2001, Nathan's class went on a field trip to a farm. Nathan's teacher brought along Nathan's asthma inhaler and EpiPen, which could be used to inject a dose of epinephrine in case of a severe allergic reaction. The school provided sack lunches for the students, and the teachers made no special request for Nathan. The sack lunch contained a peanut butter and jelly sandwich, trail mix, carrots, an apple, and a peanut butter cookie. Nathan gave the sandwich and the trail mix to his teacher, but ate at least part of the peanut butter cookie before realizing what it was. He started to feel ill, and he returned to the bus with a parent chaperone who is also a nurse. Nathan's teacher and the chaperone communicated with Nathan's father's partner by phone three times. Because Nathan suffered from frequent asthma attacks, which had in the past been exacerbated by anxiety, the partner told them to use the inhaler and try to calm Nathan down. When Nathan's condition worsened, the teacher, nurse, and partner decided that Nathan should be driven home.
¶ 6 A parent volunteer drove while Nathan and the volunteer nurse chaperone sat in the backseat. Nathan's condition worsened dramatically, and they stopped at a fire station for help. Though Nathan was adamant that he did not want to use the EpiPen, the nurse administered the shot. Meanwhile, a maintenance worker at the fire station, who was also a volunteer fire fighter, radioed for help. Almost immediately after the shot, Nathan stopped breathing and he had no pulse, so the nurse and fire fighter administered CPR (cardiopulmonary resuscitation). Emergency personnel arrived and took Nathan to the hospital, where he died later that afternoon.
¶ 7 The school district associate superintendent and superintendent were notified that afternoon. Both appreciated the gravity of the situation and activated the school district's crisis counseling system. The superintendent and the school district community relations director provided interviews to the press. Reporters from The Spokesman-Review learned Nathan's teacher's name from a student in the class, but both Nathan's principal and his teacher declined to speak with reporters. Reporters were able to interview one of the parent chaperones and some students who were on the field trip. Other school district personnel discussed with reporters details about the support being provided to classmates and students at Logan.
¶ 8 The school district superintendent also immediately anticipated a wrongful death action and contacted the school district's long-standing legal counsel. Over the weekend following Nathan's death, the superintendent and associate superintendent had several meetings with counsel, John Manix and Paul Clay. The team decided that the law firm would hire a private investigator to interview witnesses. The firm hired David Prescott, and he began interviewing witnesses the following Monday morning. Clay and Manix also confirmed with the school district's insurance company that they would be the attorneys retained by the company to represent the school district.
¶ 9 The attorneys shared with Prescott their factual theories and what they perceived to be the strengths and weaknesses of a wrongful death case against the school district. Clay gave Prescott examples of questions to ask school personnel and witnesses, and Clay explained the information he wanted from each witness. Clay directed Prescott to contact Clay or Manix after each interview to report and to get direction as to *66 whom he should interview next. As the interviews progressed, Prescott reported to and provided interview notes for the attorneys as directed, and the attorneys discussed with him in detail the information he should cover with each witness and why that information was important, in light of their assessments as to the legal and factual issues presented by the potential (and later actual) wrongful death claim. At all times during his investigation, Prescott understood the purpose of his work was to assist the firm in preparing to defend against civil liability claims involving Nathan's death. Prescott's fees were paid by the school district's insurance company.
¶ 10 The attorneys and Prescott believed that several school district employees and volunteers were also their individual clients because the school district's insurance policy provided them coverage. The attorneys assured these clients that their communications with Prescott and the attorneys were protected by attorney-client privilege. The two teachers on the field trip retained their own lawyers, but Clay and Manix also represented them to the extent that the school's insurance policy covered them. The teachers' attorneys entered into joint representation agreements with Clay and Manix to ensure that communications among the attorneys and those clients would remain privileged.
¶ 11 The superintendent held a press conference on May 22, a few days after Nathan's death and the school district issued a press release. The press release detailed the events of May 18, including when Nathan became ill and what decisions were made to provide for his care. The superintendent also reported that the school district had provided the lunch to Nathan despite the fact that they knew of his allergy. A reporter from The Spokesman-Review interviewed fire station personnel who explained what had happened at the fire station. Then on May 24, The Spokesman-Review reporter interviewed the superintendent again, discussing the school district's decision to eliminate peanut butter cookies from their menu.
¶ 12 Also on May 23, 2001, the school district received notice that Nathan's parents and Nathan's estate had retained counsel. CP at 395. Counsel for Nathan's parents informed Clay and Manix that the Walters family intended to file a wrongful death claim against the school district. Id. The Spokesman-Review reporter spoke with Nathan's parents' attorney and as information became available, the attorney talked to the reporter about the cause of death and the medical examiner's report.
¶ 13 Then in August 2001, Nathan's parents and the school district agreed to enter into mediation. On August 13, 2001, the day before mediation began, a reporter for The Spokesman-Review requested "copies of all material related to the investigation and possible settlement of Nathan Walters' death," pursuant to former chapter 42.17 RCW, the open Public Records Act. Clerk's Papers (CP) at 29. Upon receipt of the records request, the school district attorneys contacted the newspaper's attorneys for clarification regarding the request.
¶ 14 While the newspaper's records request was pending, the August 2001 mediation led to a settlement agreement between the school district and Nathan's parents and his estate. According to the agreement, the Walters family released all claims against the school district in exchange for a $25,000 donation to the Food Allergy & Anaphylaxis Network, and $960,000 to the Walters family and Nathan's estate. In addition, the school district agreed to create a task force to address the issue of food allergies in the schools. Finally, the parties agreed to issue a joint press release, but otherwise all parties, including the school district and its employees, would decline to comment to the press about the case. The settlement agreement acknowledged, however, that public disclosure law could require the school district to disclose some documents, but the school district agreed to notify the Walters family before doing so.
¶ 15 After the settlement, the parties issued a joint press release, giving some, but not all of the details regarding the settlement, acknowledging that there were some misleading reports in the press about the circumstances of Nathan's death, and requesting for the family's sake that the details not be further discussed in the press. Nevertheless, *67 two of the field trip chaperones gave extensive interviews to The Spokesman-Review, including the chaperone who drove Nathan to the fire station. Nathan's parents and Nathan's father's partner also gave interviews. Neither of the teachers on the trip nor the volunteer nurse chaperone ever agreed to an interview.
¶ 16 Apparently after clarifying The Spokesman-Review's request, the school district compiled the requested documents and submitted an index to The Spokesman-Review. The index revealed that there were 75 documents at issue, including the settlement agreement (document 1), the school district's investigation report (document 2), handwritten investigation notes taken by Prescott and the attorneys when interviewing witnesses on behalf of the school district, correspondence between the attorneys and the insurance company, a memorandum in preparation for mediation, written statements of three clients, and pictures and a map of the farm. The index briefly explains the school district's reasoning for denying The Spokesman-Review access to each document.
¶ 17 On October 2, 2001, the school district, Nathan's estate, and Nathan's parents jointly filed a petition for declaratory judgment, asking the court to declare that the records sought were exempt from disclosure under former chapter 42.17 RCW.[2] Nathan's parents also sought a permanent injunction, asking the court to enjoin the school district from releasing the records. In his declaration, one of the school district attorneys explained that the school district was in a precarious legal position because Nathan's parents were arguing that the school district was legally prohibited from disclosing the settlement agreement and investigation records pursuant to Family Educational Rights and Privacy Act of 1974 (FERPA), 20 U.S.C. § 1232(g), the violation of which would place at risk the school district's $26 million in federal funding.[3] On the other hand, The Spokesman-Review was insisting that disclosure was required under the Public Records Act. In addition, the school district asserted that the investigation records were independently exempt from disclosure under the Public Records Act's exemption for "[r]ecords that are relevant to a controversy to which an agency is a party." RCW 42.56.290 (formerly RCW 42.17.310(1)(j)).
¶ 18 The Spokesman-Review's records request was formally denied by letter on October 15. The Spokesman-Review[4] then filed a motion for an order to show cause why the school district had refused to disclose the settlement agreement. The trial court granted release of the settlement agreement over Nathan's mother's objection.[5]The Spokesman-Review filed another motion for an order to show cause why the school district had not disclosed its investigation records. Soon after, the school district moved for summary judgment, asking the court to declare documents 3-75 exempt from disclosure. The Spokesman-Review argued, in response to the school district's summary judgment motion, that the school district was procedurally barred from initiating an action to request that the trial court declare documents exempt from disclosure. The trial court heard argument from The Spokesman-Review and the school district, but no attorney for Nathan's mother appeared.
¶ 19 The trial court concluded that "[b]y operation of [RCW 42.56.290, formerly] RCW 42.17.310(1)(j), the protections of the attorney-client privilege, or the work product doctrine, or both, exempt Document Nos. 3 through 75 from production to [The Spokesman-Review]." CP at 765. But the trial court granted The Spokesman-Review's request *68 for disclosure of document 2, a Spokane public schools incident report that had been prepared not by counsel, but by school district personnel. The trial court also concluded:
The Court has considered [The Spokesman-Review's] position regarding whether or not the School District's choice of pleading and request for relief was appropriate pursuant to the Public Disclosure Act. It was more or less conceded during oral argument, as well as by the fact that [The Spokesman-Review] filed a companion Show Cause Motion, that regardless of the procedure, the parties' substantive arguments and the issues should be resolved on the merits and the Court hereby does so. If the procedural argument was not conceded, the Court's ruling is that whatever procedural defect that may have been present is not fatal, especially in light of the Show Cause motion brought by [The Spokesman-Review].
CP at 765-66.
¶ 20 The Spokesman-Review appealed. Division Three of the Court of Appeals affirmed, concluding that the documents at issue were all generated by the school district's attorneys or its investigators. Soter v. Cowles Publ'g Co., 131 Wash.App. 882, 889, 130 P.3d 840 (2006). Thus, the documents were "`classic'" attorney work product and were not subject to disclosure because none of the asserted exceptions to the work product doctrine applied. Id. at 894, 130 P.3d 840 (quoting CP at 760). The Court of Appeals also noted that at least some of the documents were also protected by attorney-client privilege. Id. at 903-04, 130 P.3d 840. Finally, the Court of Appeals concluded that an agency, here the school district, may properly seek a judicial ruling on the merits as to whether documents must be disclosed pursuant to RCW 42.56.540 (formerly RCW 42.17.330). Id. at 907, 130 P.3d 840.
¶ 21 The Spokesman-Review then sought discretionary review in this court, asking us to determine whether the documents at issue here are exempt from disclosure. The Spokesman-Review also challenges the holding that an agency has authority to seek a judicial ruling as to whether a requested document is exempt from public disclosure.

II

Analysis
¶ 22 The public disclosure act, formerly chapter 42.17 RCW, was enacted in 1972 by initiative. Dawson v. Daly, 120 Wash.2d 782, 788, 845 P.2d 995 (1993). The portion dealing with public records has since been recodified at chapter 42.56 RCW and renamed the Public Records Act. RCW 42.56.020. It requires that "[e]ach agency, in accordance with published rules, shall make available for public inspection and copying all public records, unless the record falls within the specific exemptions of . . . this chapter, or other statute which exempts or prohibits disclosure of specific information or records." RCW 42.56.070(1) (formerly RCW 42.17.260(1)). We have recognized that the Public Records Act "is a strongly worded mandate for broad disclosure of public records." Hearst Corp. v. Hoppe, 90 Wash.2d 123, 127, 580 P.2d 246 (1978). The act should be liberally construed and its exemptions should be narrowly construed in favor of disclosure. RCW 42.56.030 (formerly RCW 42.17.251). But where a listed exemption squarely applies, disclosure is not appropriate. See RCW 42.56.070(1). The school district does not dispute that the records at issue here are public records or that the school district is an agency for purposes of the Public Records Act. Thus, the only question before us is the extent to which an exemption to disclosure applies to any or all of the requested documents. Judicial review of agency action taken or challenged under RCW 42.56.030 through .520 shall be de novo, and a court may examine the records in camera to determine whether disclosure is proper. RCW 42.56.550(3).

A. Requested Records
¶ 23 Agencies bear the burden of establishing that a particular public disclosure exemption applies. RCW 42.56.550(1). RCW 42.56.290 (formerly RCW 42.17.310(1)(j)) exempts from public disclosure "[r]ecords that are relevant to a controversy to which an agency is a party but which records would not be available to another *69 party under the rules of pretrial discovery for causes pending in the superior courts." Any materials that would not be discoverable in the context of a controversy under the civil rules of pretrial discovery are also exempt from public disclosure under RCW 42.56.290. Guillen v. Pierce County, 144 Wash.2d 696, 713, 31 P.3d 628 (2001), rev'd on other grounds, Pierce County v. Guillen, 537 U.S. 129, 123 S.Ct. 720, 154 L.Ed.2d 610 (2003); Limstrom v. Ladenburg, 136 Wash.2d 595, 605, 963 P.2d 869 (1998). This exemption from public disclosure "relies on the rules of pretrial discovery to define the parameters of the work product rule for purposes of applying the exemption." Limstrom, 136 Wash.2d at 605, 963 P.2d 869. The school district argues that the records at issue here would not have been discoverable in a civil action against the school district because the documents are protected attorney work product or because they involve privileged attorney client communications.

Controversy
¶ 24 As an initial matter, we must determine whether a sufficient "controversy" existed for the school district to invoke the "controversy" exception. We have defined the term "controversy" as "completed, existing, or reasonably anticipated litigation." Dawson, 120 Wash.2d at 791, 845 P.2d 995. We have recognized that RCW 42.56.290's protection is triggered "prior to the official initiation of litigation and extends beyond the official termination of litigation." Id. at 790, 845 P.2d 995. Furthermore, where the work product doctrine is concerned, it is well-settled that the protection applies to materials created in anticipation of litigation, even after that litigation has terminated. See Harris v. Drake, 152 Wash.2d 480, 489-90, 99 P.3d 872 (2004); see also Limstrom, 136 Wash.2d at 613, 963 P.2d 869, and Pappas v. Holloway, 114 Wash.2d 198, 210, 787 P.2d 30 (1990).
¶ 25 The dissent ignores the well-settled parameters of the controversy exception discussed in Harris, 152 Wash.2d at 489-90, 99 P.3d 872; Limstrom, 136 Wash.2d at 613, 963 P.2d 869; Dawson, 120 Wash.2d at 791, 845 P.2d 995; Pappas, 114 Wash.2d at 210, 787 P.2d 30, and without citation, advocates disclosure of attorney work product once a controversy has been resolved. Dissent at 82-83. This court has repeatedly discussed the principle that the work product protection can be preserved only if it continues even after the prospect of litigation has terminated. E.g., Harris, 152 Wash.2d at 489-90, 99 P.3d 872. We have explicitly rejected the view advocated by the dissent, finding instead that protection both before reasonably anticipated litigation and after resolution of a controversy comply with the "clear intent of the statute." Dawson, 120 Wash.2d at 791, 845 P.2d 995. "We do not distinguish between completed and pending cases," in part because the looming possibility of disclosure, even disclosure after termination of the lawsuit, would cause clients and witnesses to hesitate to reveal details to the attorneys, and it would cause attorneys to hesitate to reduce their thoughts or understanding of the facts to writing. Limstrom, 136 Wash.2d at 613, 963 P.2d 869; Pappas, 114 Wash.2d at 209-10, 787 P.2d 30 (citing Hickman v. Taylor, 329 U.S. 495, 67 S.Ct. 385, 91 L.Ed. 451 (1947)).
¶ 26 The Spokesman-Review and amici Allied Daily Newspapers argue that the documents at issue should be treated as if they were created in the ordinary course of business, not in anticipation of litigation. But specific litigation was anticipated from the outset in this case, reasonably so given the facts, and the dominant purpose of the attorneys' investigation was to prepare to defend a claim brought by Nathan's family.[6] CP at 517-18; 380-84; see also Heidebrink v. Moriwaki, 104 Wash.2d 392, 400-01, 706 P.2d 212 (1985) (recognizing that statements made to attorneys hired by an insured's insurance company are "obviously . . . made in anticipation of litigation.").[7] Thus, the Walters *70 family's potential wrongful death claim against the school district amounts to a "controversy" for purposes of RCW 42.56.290, the controversy exception still applies even though the claim has been settled, and the documents at issue were prepared in anticipation of litigation. The documents at issue were created by or gathered by members of the legal team. See CP at 411-25 (Index 1-15). Thus, we conclude that the trial court and Court of Appeals were correct in classifying the documents as work product.

Discoverability
¶ 27 Washington's Civil Rule (CR) 26(b)(4) governs discovery of materials generated in preparation for trial, codifying the work product protection, and we have held that this rule also governs disclosure under the controversy exception of the Public Records Act, RCW 42.56.290. Limstrom, 136 Wash.2d at 609, 963 P.2d 869. If the documents at issue here are discoverable under CR 26, then they are subject to disclosure under the act. See id. But if they are protected under CR 26's work product protection or its incorporation of attorney-client privilege, then the documents are not subject to public disclosure. See id.; see also Cowles Publ'g Co. v. Spokane Police Dep't, 139 Wash.2d 472, 478, 987 P.2d 620 (1999) ("[D]ocuments are protected from disclosure to the extent they are attorney `work product' under the civil discovery rules.").
¶ 28 Notes Regarding Oral Communications with Witnesses and the Work Product Protection: The vast majority of documents at issue in this case are handwritten notes taken by members of the legal team regarding interviews of witnesses. An examination of the development of the work product protection for these types of documents explains the rationale for our treatment of such documents.
¶ 29 Hickman v. Taylor, 329 U.S. 495, 67 S.Ct. 385, 91 L.Ed. 451 (1947) was the United States Supreme Court's landmark examination of attorney work product protection. In that case, the defendants owned a tugboat that capsized, killing several crewmembers. Id. at 498, 67 S.Ct. 385. The tugboat owners immediately hired an attorney, who interviewed the surviving crewmembers and other witnesses, anticipating litigation. Id. When a representative of a deceased crewmember sued, he sought access to the surviving crewmembers' statements and to the attorney's notes regarding his conversations with other witnesses. Id. at 498-99, 67 S.Ct. 385. The Hickman Court recognized:
it is essential that a lawyer work with a certain degree of privacy, free from unnecessary intrusion. . . . Proper preparation of a client's case demands that [the lawyer] assemble information, sift what he considers to be the relevant from the irrelevant facts, prepare his legal theories and plan his strategy without undue and needless interference. . . . Were [the work product of an attorney] open to opposing counsel on mere demand, much of what is now put down in writing would remain unwritten.
Id. at 510-11, 67 S.Ct. 385. The Hickman Court went on to hold that the attorney's notes reflecting witness statements in that case were not discoverable. While the Court did not go so far as to conclude that an attorney's notes regarding his interviews with witnesses could never be discovered, the Court made it clear that such notes would be discoverable only in rare circumstances. Id. at 513, 67 S.Ct. 385.
¶ 30 In 1970, in response to lower courts' inconsistent application of Hickman's work product rule, the United States Supreme Court adopted Federal Rule of Civil Procedure (Fed.R.Civ.P.) 26(b)(3), which codified and clarified the Hickman rule. Lewis H. Orland, Observations on the Work Product Rule, 29 Gonz. L.Rev. 281, 282 (1994). The federal rule provides in relevant part:
a party may obtain discovery of documents and tangible things otherwise discoverable under subdivision (b)(1) of this rule and prepared in anticipation of litigation or for trial by or for another party or by or for that other party's representative (including the other party's attorney, consultant, surety, indemnitor, insurer, or agent) only upon a showing that the party seeking discovery has substantial need of the materials *71 in the preparation of the party's case and that the party is unable without undue hardship to obtain the substantial equivalent of the materials by other means. In ordering discovery of such materials when the required showing has been made, the court shall protect against disclosure of the mental impressions, conclusions, opinions, or legal theories of an attorney or other representative of a party concerning the litigation.
Fed.R.Civ.P. 26(b)(3). The 1970 advisory committee notes accompanying Fed.R.Civ.P. 26(b)(3) explained a "`basic standard,'" under which ordinary work product may be revealed to opposing counsel: the party seeking access to the documents must make a special showing of substantial need and a showing that he or she cannot elsewhere obtain the substantial equivalent of the materials without undue hardship. Orland, supra, at 282. Distinguished from the basic standard, is the "`Treatment of Lawyers; Special Protection of Mental Impressions, Conclusions, Opinions, and Legal Theories Concerning the Litigation.'" Id. Orland explained:
The Notes recognize that the text of 26(b)(3) is intended to protect the lawyer's "mental impressions, conclusions, opinions, or legal theories," but in the midst of the discussion, the Notes interject this statement: "The Hickman opinion drew special attention to the need for protecting an attorney against discovery of memoranda prepared from recollection or oral interviews."

Orland, supra, at 282-83 (quoting Fed. R.Civ.P. 26(b)(3) Notes of Advisory Comm. on 1970 amends. (emphasis added)). Thus, the 1970 notes accompanying the federal rule suggest that notes and memoranda prepared to memorialize an attorney's interview of a witness should be treated as materials that reveal the attorney's mental impressions, conclusions, opinions, and legal theories. See Orland, supra, at 282-83.
¶ 31 Then in 1981, the United States Supreme Court further discussed the application of the work product rule to an attorney's interview notes. In Upjohn Co. v. United States, 449 U.S. 383, 101 S.Ct. 677, 66 L.Ed.2d 584 (1981), the company became aware that one of its foreign subsidiaries might be engaging in illegal activity. Id. General counsel for the company decided to conduct an internal investigation, which generated documents, including written communications between Upjohn employees and the company's general counsel, id. at 387-88, 101 S.Ct. 677, as well as counsel's notes and memoranda regarding interviews with nonemployee, nonclient witnesses. Id. at 397, 101 S.Ct. 677. The Internal Revenue Service demanded access to these internal investigation documents. Id. at 387-88, 101 S.Ct. 677. With regard to the attorney's interviews with nonclients, Upjohn claimed that the work product rule protected the attorney's notes of these conversations, and Upjohn refused to disclose the notes to government investigators. Id. at 398-99 n. 6, 101 S.Ct. 677. The Court agreed, emphasizing the strong public policy underlying the work product doctrine, and the need for an attorney to work without fear of having to turn his notes over to opposing counsel. Id. at 398, 101 S.Ct. 677. Even where the witnesses at issue were spread all over the globe and where Upjohn had forbidden its employees to answer some government questions, the Court emphasized that "[f]orcing an attorney to disclose notes and memoranda of witnesses' oral statements is particularly disfavored because it tends to reveal the attorney's mental processes." Id. at 399, 101 S.Ct. 677. The Court referred to Hickman, recognizing that an attorney's interview notes reveal what the attorney saw fit to write down regarding the witness's remarks. See id. Any notes written by the attorney would be in his or her own language and permeated with his or her inferences. Id. at 399-400, 101 S.Ct. 677 (citing Hickman, 329 U.S. at 513, 516-17, 67 S.Ct. 385 (Jackson, J. concurring)). The Upjohn Court acknowledged that the language of Fed. R.Civ.P. 26(b)(3) did not explicitly refer to the legal team's memoranda or notes based on oral statements of witnesses, but the Court also emphasized that the Hickman Court had "stressed the danger that compelled disclosure of such memoranda would reveal the attorney's mental processes." Id. at 400, 101 S.Ct. 677.
¶ 32 The Upjohn Court concluded that it was clear that an attorney's notes regarding *72 witness interviews were "the sort of material the draftsmen of the Rule had in mind as deserving special protection." Id. And though the Court declined to decide whether such materials would always be protected by the work product rule, the Court did conclude that "such work product cannot be disclosed simply on a showing of substantial need and inability to obtain the equivalent without undue hardship." Id. at 401, 101 S.Ct. 677. "[A] far stronger showing of necessity and unavailability by other means" would be necessary to compel disclosure of an attorney's notes regarding his oral communications with a witness. Id. at 401-02, 101 S.Ct. 677. Thus, the United States Supreme Court has recognized that the federal work product rule, at the very least, provides more stringent protection for an attorney's notes regarding his or her oral communications with a witness than it does for other work product that is not so intimately connected with the attorney's thoughts and mental processes.
¶ 33 After Upjohn, many of the federal circuit courts have applied heightened protection to an attorney's notes taken during witness interviews, allowing discovery only in "very rare and extraordinary circumstances." Baker v. Gen. Motors Corp., 209 F.3d 1051, 1054 (8th Cir.2000). For example, in Baker, the Eighth Circuit classified "[n]otes and memoranda of an attorney, or an attorney's agent, from a witness interview" as "opinion work product entitled to almost absolute immunity." Id. at 1054; see also In re Grand Jury Proceedings, 473 F.2d 840, 848 (8th Cir.1973) (distinguishing between an attorney's notes and a statement prepared and signed by the witness and holding an "attorney's personal recollections, notes, and memoranda" reflecting witness oral statements are "absolutely, rather than conditionally, protected."). The Baker court reiterated: "[a]ttorney notes reveal an attorney's legal conclusions because, when taking notes, an attorney often focuses on those facts that she deems legally significant." Baker, 209 F.3d at 1054; see also In re Allen, 106 F.3d 582, 608 (4th Cir.1997) (information gained from a witness interview and memorialized in a summary "tends to indicate the focus of . . . investigation."); Cox v. Adm'r United States Steel & Carnegie, 17 F.3d 1386, 1422 (11th Cir.1994) (reading Upjohn to insist that an attorney's notes and memoranda of witness's oral statements is considered to be highly protected opinion work product); Sec. & Exch. Comm'n v. Brady, 238 F.R.D. 429, 442 (N.D.Texas 2006) (classifying notes and memoranda created by an attorney or his agent regarding witness interviews as opinion work product because they are suffused with investigator's mental impressions or conclusions) (citing Dunn v. State Farm Fire & Cas. Co., 927 F.2d 869, 875 (5th Cir.1991)).
¶ 34 Turning to Washington, the language of our CR 26(b)(4) is nearly identical to Fed.R.Civ.P. 26(b)(3).[8] Washington's CR 26 governs discovery of materials generated in preparation for trial, and we have held that this rule also governs disclosure under the controversy exception contained in the Public Records Act, RCW 42.56.290. Limstrom, 136 Wash.2d at 608-09, 963 P.2d 869. CR 26(b)(4) explains that otherwise discoverable materials prepared in anticipation of litigation or for trial may be disclosed "only upon a showing that the party seeking discovery has substantial need of the materials in the preparation of his case and that he is unable without undue hardship to obtain the substantial equivalent of the materials by other means." Under CR 26(b)(1), privileged materials are not otherwise discoverable, and CR 26(b)(4), like the federal rule, provides that, "the court shall protect against disclosure of the mental impressions, conclusions, opinions, or legal theories of an attorney or other representative of a party concerning the litigation."[9] (Emphasis added.) *73 Thus, privileged information and a legal team's mental impressions, conclusions, opinions, or theories are almost always exempt from discovery, regardless of the level of need. CR 26(b)(1), (4). Where a state rule is identical to its federal counterpart, analyses of the federal rule provides persuasive guidance as to the application of our comparable state rule. E.g., Beal v. City of Seattle, 134 Wash.2d 769, 777, 954 P.2d 237 (1998).
¶ 35 Like the federal rule, the text of our rule does not conclusively establish whether an attorney's or a member of the legal team's notes from oral interviews constitute opinion work product that is almost always exempt from discovery. As discussed above, at least one Washington commentator, however, has studied this issue with regard to the federal rule. Orland, supra, at 283-84. Based on the advisory committee notes accompanying the federal rule, the analyses of other prominent commentators, and an analysis of the underlying rationale for the United States Supreme Court's holdings in Hickman and Upjohn, Orland proposed a comprehensive articulation of the work product rule. Orland, supra, at 294, 300-01. He concluded that the mental impressions of an attorney or other representative of a party and notes or memoranda prepared by the lawyer from oral communications should be absolutely protected unless the lawyer's mental impressions are at issue. Id.
¶ 36 In 1998, this court adopted Orland's analysis in Washington, specifically in the context of a public records case, though the analysis was not limited to public record requests:
(1) The mental impressions of the attorney and other representatives of a party are absolutely protected, unless their mental impressions are directly at issue.
(2) The notes or memoranda prepared by the attorney from oral communications should be absolutely protected, unless the attorney's mental impressions are directly at issue.

(3) The factual written statements and other tangible items gathered by the attorney and other representatives of a party are subject to disclosure only upon a showing that the party seeking disclosure of the documents actually has substantial need of the materials and that the party is unable, without undue hardship, to obtain the substantial equivalent of the materials by other means. Mental impressions of the attorney and other representatives embedded in factual statements should be redacted.
Limstrom, 136 Wash.2d at 611-12, 963 P.2d 869 (emphasis added) (citations omitted). Thus, this court has already interpreted CR 26(b)(4) to mean that notes or memoranda prepared by the attorney from oral communications should receive heightened protection. Id. Only in rare circumstances, for example when the attorney's mental impressions are directly at issue, can an attorney or legal team member's notes reflecting oral communications be revealed. Id.[10]
¶ 37 The Spokesman-Review and the dissent challenge the Limstrom court's almost absolute protection for a legal team's notes prepared from oral communications, arguing instead that the trial court in this case should have redacted statements of the legal team's opinions and mental impressions and then disclosed the documents.[11] This argument *74 suggests confusion between access to the underlying facts, i.e., what happened on the field trip, and access to the documents in which those facts are recorded. E.g., In re Firestorm 1991, 129 Wash.2d 130, 160, 916 P.2d 411 (1996) (Madsen, J., concurring); Broadnax v. ABF Freight Sys., 180 F.R.D. 343, 345 (N.D.Ill.1998); In re Murphy, 560 F.2d 326, 336 n. 20 (8th Cir.1977); see also dissent at 84. The work product rule protects documents and tangible things prepared in anticipation of litigation, and it protects those documents that tend to reveal an attorney's thinking almost absolutely. CR 26(b)(4).
¶ 38 While The Spokesman-Review and the dissent attempt to sidestep the Limstrom analysis, if we are to reveal any portion of the legal team's handwritten notes regarding their witness interviews, then we have to directly overturn Limstrom's heightened protection to do it. But close examination reveals that the Limstrom court's analysis is supported by sound reasoning. As noted above, the United States Supreme Court has twice recognized that "[f]orcing an attorney to disclose notes and memoranda of witnesses' oral statements is particularly disfavored because it tends to reveal the attorney's mental processes." Upjohn, 449 U.S. at 399, 101 S.Ct. 677; Hickman, 329 U.S. at 513, 67 S.Ct. 385. An attorney's notes regarding a witness's oral statements are permeated with his or her inferences, as well as clues as to the portions of a statement the attorney believed to be important. See Upjohn, 449 U.S. at 399-400, 101 S.Ct. 677; Hickman, 329 U.S. at 513, 67 S.Ct. 385. The Court has also recognized that where the rule might allow an attorney's notes to be revealed, attorneys will hesitate to keep such notes, leading to inefficiencies in the practice of law. Hickman, 329 U.S. at 510-11, 67 S.Ct. 385 ("Were [the work product of an attorney] open to opposing counsel on mere demand, much of what is now put down in writing would remain unwritten."). The necessity for protection of attorney work product does not diminish because an attorney represents a government agency. Regardless of who the client is, "`the attorney's professional task is to provide his client a frank appraisal of strength and weakness, gains and risks, hopes and fears.'" Port of Seattle v. Rio, 16 Wash.App. 718, 724-25, 559 P.2d 18 (1977) (quoting Sacramento Newspaper Guild v. Sacramento County Bd. of Supervisors, 263 Cal.App.2d 41, 56, 69 Cal.Rptr. 480 (1968)).[12]
¶ 39 Moreover it is important to consider that while this case happens to be a *75 public records case, when evaluating the extent of the protection offered by CR 26(b)(4), we are interpreting the civil discovery rule that applies to all civil cases. When we interpret the meaning of CR 26(b)(4)'s work product protection, we not only impact attorneys representing government agencies, but we will impact all attorneys engaging in civil practice. See Limstrom, 136 Wash.2d at 611-12, 963 P.2d 869. Given all of the above considerations, we decline to abandon the Limstrom analysis and instead we classify an attorney or legal team's notes regarding witness interviews as highly protected opinion work product.
¶ 40 The vast majority of the records requested in this case are handwritten notes created either by the school district's attorneys or by Prescott, the investigator hired by the attorneys in anticipation of litigation. These notes reflect the attorneys' and investigator's thoughts regarding client and witness interviews. Documents 5, 9, 11-14, 16-18, 21, 23, 26, 28, 30, 34, 37, 41-44, 46-50, 52, 55-56, 67-70 (attorneys); Documents 4, 7-8, 10, 15, 19-20, 22, 24-25, 27, 29, 31-33, 35-36, 38, 45, 51, 53, 58-62, 65 (Prescott). In addition, document 40 is a memorandum drafted by the attorneys, compiling from the interviews what they deemed to be relevant facts. Significantly, many of the handwritten notes created by the attorneys were notes regarding conversations between the attorney and the investigator about the investigator's witness interviews. Thus, comparison of the investigator's notes and the attorneys' notes reveals what information the attorney deemed particularly important and, conversely, what the attorney did not find important enough to record. Compare, e.g., Document 4 with Document 5, Document 8 with Document 9, Document 6 with Document 12, Document 7 with Document 14. Thus, the school district has established that all of the handwritten notes and memoranda discussing client interviews are protected opinion work product.[13]
¶ 41 In sum, we decline to overrule Limstrom and we conclude that all of the notes taken by attorneys or other members of a legal team when interviewing witnesses constitute opinion work product that will be revealed only in rare circumstances, for example, where the attorney's mental impressions are at issue or where there are issues of attorney crime or fraud. Limstrom, 136 Wash.2d at 611-12, 963 P.2d 869. Neither of these limited exceptions applies here and thus these documents are exempt from disclosure under the controversy exemption to the Public Records Act.[14]
¶ 42 Notes Regarding Oral Communications with Clients and Attorney Client Privilege: For purposes of discovery of trial preparation materials, CR 26(b)(4) *76 allows disclosure of records only if their contents are not otherwise protected by privilege. CR 26(b)(1).[15] Thus, where a controversy is at issue, privileged communications contained in documents are exempt from disclosure by way of the Public Records Act's reliance on CR 26(b). See Hangartner v. City of Seattle, 151 Wash.2d 439, 452, 90 P.3d 26 (2004) ("The controversy exemption exempts documents that are `relevant to a controversy' and unobtainable through pretrial discovery, which will include some documents also covered by the attorney-client privilege."); O'Connor v. Dep't of Soc. & Health Servs., 143 Wash.2d 895, 909, 25 P.3d 426 (2001) (civil rules govern discovery of any matter not privileged, which is relevant to the subject matter involved). The party asserting attorney-client privilege has the burden of showing the attorney-client relationship existed and that relevant materials contain privileged communications. See Dietz v. Doe, 131 Wash.2d 835, 844, 935 P.2d 611 (1997).
¶ 43 The attorney-client privilege exists to allow clients to communicate freely with their attorneys without fear of later discovery. Id. at 842, 935 P.2d 611. The privilege encourages free and open communication by assuring that communications will not later be revealed directly or indirectly. Id. (citing Pappas, 114 Wash.2d at 203, 787 P.2d 30). "The attorney-client privilege applies to communications and advice between an attorney and client and extends to documents that contain a privileged communication." Id. (emphasis added).
¶ 44 Several of the documents at issue contain notes regarding privileged communications between the legal team and their clients. The Spokesman-Review specifically complains that it could not obtain interviews with Nathan's teacher, the other teacher on the field trip, or with the volunteer nurse chaperone. CP at 301, 330. But the teachers and volunteer nurse chaperone were clients whose communications with the attorneys were privileged. The attorneys explained to both the volunteer nurse chaperone and the teachers that because each was a school district employee or volunteer, the school district's insurance policy would cover liability claims against them personally. Because Clay and Manix had been appointed by the insurance company to defend claims impacting the school district's insurance, the attorneys would represent them in any lawsuit arising out of Nathan's death. E.g., CP at 513, 543. Although the teachers had also retained private counsel, they understood that their counsel and the school district's attorneys had entered into joint representation agreements based on the fact that school district's insurance would cover any liability claim against them. CP at 512-13, 547-49.
¶ 45 The Spokesman-Review does not challenge the declarations and affidavits stating that school district personnel and volunteers would be covered under the school district's insurance policy, and because the attorneys here were representing the school district and its insurance company, school district personnel and volunteers involved in the field trip were considered clients. More importantly, these people believed they were clients. See Dietz, 131 Wash.2d at 843, 935 P.2d 611 (Attorney-client relationship exists if the conduct between the attorney and client is such that the client subjectively believes the relationship exists. The belief of the client will control so long as it is reasonably formed considering the circumstances.); see also Pappas, 114 Wash.2d at 203, 787 P.2d 30.
¶ 46 Documents 4-6, 12, 15-17, 20-21, 26, 36-38, 46-50, 55-56, and 67-70 are all handwritten notes detailing attorney or investigator conversations with the teachers, the volunteer nurse chaperone, or other school district employees at risk of personal liability who were all told they were clients. Even if these documents are not protected from disclosure by the work product rule, they are protected by the attorney client privilege.
*77 ¶ 47 Documents Created by Clients for Their Lawyers and Attorney Client Privilege: Documents 3 and 74 are notes prepared by the volunteer nurse chaperone who sat with Nathan on the bus, rode with him in the car, and administered the epinephrine. CP at 541-42. Similarly, document 66 contains handwritten notes created by one of the teachers on the field trip.
¶ 48 Based on assurances from the attorneys that her notes would be protected by attorney client privilege, the nurse shared document 3 with the attorneys and their investigator. CP at 544-45. She has declared that based on her training, she prepared these notes in anticipation of litigation and for the purpose of providing them to an attorney representing her. CP at 542, 544. Later, at the request of the attorneys, the nurse created document 74, which includes notes in response to another parent-volunteer's account of what had happened on the field trip. CP at 544. Similarly, the teacher prepared her notes at the request of her personal counsel and she shared the notes with her counsel and the school district's counsel. CP at 512, 514. Finally, document 57 contains typewritten notes created by the school office manager, obviously a school district employee, specifically for school district legal counsel. CP at 412 (Index at 11).
¶ 49 Documents 3, 57, 66, and 74 were created by clients, in anticipation of litigation, with the intention of communicating information to the attorneys. Therefore, we conclude that the school district has established that these documents are protected from disclosure under the attorney-client privilege. Dietz, 131 Wash.2d at 842, 935 P.2d 611.
¶ 50 Other Documents: The index of relevant records contains additional documents that are not interview notes created by members of the school district's legal team or documents created by clients. These documents are enumerated 63 and 64. Document 63 is a collection of pictures of the farm with notes on the back of each one, simply identifying locations. Document 64 is a hand-sketched map of the farm, drawn by the investigator. As factual information gathered by an attorney's investigator, these are considered ordinary, rather than opinion, work product subject to disclosure upon a showing that there is a substantial need for the materials and that an opposing party in litigation against the school district could not, without undue hardship, obtain the substantial equivalent of the materials by other means. See O'Connor, 143 Wash.2d at 910, 25 P.3d 426 ("[P]ublic records from a public agency available to litigants against the agency by discovery under the Civil Rules are not exempt from the [P]ublic [R]ecords [A]ct."). Here, The Spokesman-Review has not argued, nor could it legitimately do so, that either the newspaper or the Walters family's investigator was unable to independently obtain these materials. Either The Spokesman-Review employees or the Walters family's investigator could have visited the farm and created a hand-drawn map or taken photos. We conclude that these documents are ordinary work product, but The Spokesman-Review has not shown that substantially similar information could not have been obtained by other means without undue hardship. Limstrom, 136 Wash.2d at 612, 963 P.2d 869.
¶ 51 Finally, throughout their briefing, The Spokesman-Review and amici assert that if we affirm the Court of Appeals based either on work product or attorney client privilege, agencies will be encouraged to hand contentious or potentially embarrassing investigations over to their attorneys to avoid public disclosure. As the Court of Appeals noted, the school district fully acknowledges the need for liberal access to agency information, but the school district also raises its countervailing duty to safeguard the public treasury by aggressively defending itself against civil liability. Soter, 131 Wash.App. at 905, 130 P.3d 840. It is essential that lawyers representing our public agencies work with a certain degree of privacy free from unnecessary intrusion, in order to assemble information, sift what they consider to be the relevant from the irrelevant facts, prepare legal theories, and plan strategy without undue interference. See Hickman, 329 U.S. at 510-11, 67 S.Ct. 385. Whether or not we agree, the legislature has provided that attorney work product and documents containing attorney-client privileged information *78 are to be protected from public disclosure under certain circumstances. RCW 42.56.290; CR 26(b). General arguments that either attorney-client privilege or the work product doctrine should not apply when a record is being sought under the Public Records Act are more properly directed toward the legislature, which is in a position to change the law if it sees fit.
¶ 52 We conclude that all of the documents sought are either protected work product or that they contain privileged information. These documents are exempt from public disclosure under RCW 42.56.290, which incorporates CR 26(b).

B. Agency Access to Superior Court
¶ 53 The Spokesman-Review argues that the Court of Appeals erred when it determined that under the public records law, either a record requester or an agency can seek a determination from superior court as to whether the documents at issue are subject to disclosure. This issue is technically moot because even though the school district and parents were first to file an action in superior court seeking declaratory judgment and an injunction, The Spokesman-Review eventually filed its own motion for an order to show cause why access to the records had been denied. CP at 284. Thus, the merits discussed above were properly before the trial court. The Court of Appeals addressed the procedural issue in its opinion, as do we, because it is likely to recur. Soter, 131 Wash.App. at 907, 130 P.3d 840; see also Cathcart-Maltby-Clearview Cmty. Council v. Snohomish County, 96 Wash.2d 201, 208, 634 P.2d 853 (1981) ("A moot case will be reviewed if its issue is a matter of continuing and substantial interest, it presents a question of a public nature which is likely to recur, and it is desirable to provide an authoritative determination for the future guidance of public officials.").
¶ 54 The Public Records Act requires agencies to respond to public records requests within five business days. RCW 42.56.520 (formerly RCW 42.17.320). The agency must either provide the records, provide a reasonable estimate of the time the agency will take to respond to the request, or deny the request. Id. Additional time may be required to respond to a request where the agency needs to notify third parties or agencies affected by the request or "to determine whether any of the information requested is exempt and that a denial should be made as to all or part of the request." Id. For practical purposes, the law treats a failure to properly respond as a denial. See RCW 42.56.550(2), (4) (formerly RCW 42.17.340) (allowing requester to challenge agency estimate of time it will take to respond and allowing imposition of daily fine for each day requester was denied access to record).
¶ 55 Denial of a public records request must be accompanied by a written statement of the specific reasons for the denial. RCW 42.56.520. Any person who is denied the opportunity to inspect or copy a public record may file a motion to show cause in superior court why the agency has refused access to the record. RCW 42.56.550(1). The burden of proof rests with the agency to establish that its refusal is consistent with a statute that exempts or prohibits disclosure. Id. Judicial review of the agency decision is de novo and the court may examine the record in camera. RCW 42.56.550(3). Thus, a requester who has been denied access to a public record may obtain judicial review of the agency's denial of the record request.
¶ 56 Any person who prevails against an agency in "any action in the courts seeking the right to inspect or copy any public record" shall be awarded all costs, including reasonable attorney fees. RCW 42.56.550(4) (emphasis added). "In addition, it shall be within the discretion of the court to award such person an amount not less than five dollars and not to exceed one hundred dollars for each day that he or she was denied the right to inspect or copy said public record." Id. We have recognized that this is a penalty intended to enforce the strong public policies underlying the act. Spokane Research & Defense Fund v. City of Spokane, 155 Wash.2d 89, 101, 117 P.3d 1117 (2005). A showing of bad faith is not required, and good faith reliance on an exemption does not preclude imposition of these penalties. Id. Finally, any per diem penalty *79 imposed for an agency's refusal to disclose public records must be assessed for each day the records were wrongfully withheld. RCW 42.56.550(4); Yousoufian v. King County Executive, 152 Wash.2d 421, 437-38, 98 P.3d 463 (2004). The trial court's discretion lies in the amount of the per day penalty, but the court may not adjust the number of days for which the agency is fined. Id. As can be seen, an agency denies a public records request at great peril.
¶ 57 Within this context, RCW 42.56.540 (formerly RCW 42.17.330) provides:
The examination of any specific public record may be enjoined if, upon motion and affidavit by an agency or its representative or a person who is named in the record or to whom the record specifically pertains, the superior court for the county in which the movant resides or in which the record is maintained, finds that such examination would clearly not be in the public interest and would substantially and irreparably damage any person, or would substantially and irreparably damage vital government functions. An agency has the option of notifying persons named in the record or to whom a record specifically pertains, that release of a record has been requested. However, this option does not exist where the agency is required by law to provide such notice.
(Emphasis added.) The Court of Appeals held that this provision allows an agency to "seek a judicial ruling on the merits when either agency functions or individuals would be irreparably damaged by disclosure," explaining:
This spares the agency the uncertainty and cost of delay, including the per diem penalties for wrongful withholding. It does not prejudice the requester. It is immaterial who hauls whom into court, because the requester who prevails in any court action over the release of public records is entitled to attorney fees.
Soter, 131 Wash.App. at 907, 130 P.3d 840. The Spokesman-Review argues that the Court of Appeals erred when it concluded that an agency can seek a judicial determination as to whether a requested record is exempt under the Public Records Act.
¶ 58 The plain language of RCW 42.56.540 allows "an agency or its representative or a person who is named in the record or to whom the record specifically pertains" to file a motion or affidavit asking the superior court to enjoin disclosure of a public record. (Emphasis added.) Therefore, it is clear that either agencies or persons named in the record may seek a determination from the superior court as to whether an exemption applies, with the remedy being an injunction.
¶ 59 But even if we were to find the language ambiguous, the legislative history supports the school district's reading. Prior to 1992, former RCW 42.17.330 allowed a superior court to enjoin the examination of a public record upon motion or affidavit, but the statute did not specify who could seek such relief. See Laws of 1992, ch. 139, § 7. Then in 1992, the following amendment to the first sentence of former RCW 42.17.330 was proposed:
The examination of any specific public record may be enjoined if, upon motion and affidavit by a person, other than an agency or its representative, who is named in the record or to whom the record specifically pertains, the superior court . . . finds that such examination would clearly not be in the public interest and would substantially and irreparably damage any person, or would substantially and irreparably damage vital government functions.
SUBSTITUTE H.B. 2876, 52d Leg., Reg. Sess., § 7 (Wash.1992) (emphasis added); see also ENGROSSED SUBSTITUTE H.B. 2876, 52d Leg., Reg. Sess., § 7 (Wash.1992). Then, pursuant to a recommendation from the Senate Committee on Governmental Operations, the senate amended the first sentence of section 7:
The examination of any specific public record may be enjoined if, upon motion and affidavit by an agency or its representative or a person who is named in the record or to whom the record specifically pertains, the superior court . . . finds that such examination would clearly not be in the public interest and would substantially and irreparably damage any person, or would substantially and irreparably damage vital governmental functions.
*80 1 SENATE JOURNAL, 52d Leg., Reg. Sess., at 1146 (Wash.1992). The house then concurred with the senate's amendments and the bill passed as amended. 2 HOUSE JOURNAL, 52d Leg., Reg. Sess., at 2181-83 (Wash.1992). The senate bill report summarized this amendment and concluded its effect was "[t]he right of agencies to request judicial review of disputed requests for disclosure is restored." S.B. REP. ON ENGROSSED SUBSTITUTE H.B. 2876, at 6, 52d Leg., Reg. Sess. (Wash 1992). Thus, the legislative history shows that the legislature specifically rejected a provision that would have barred agencies from seeking a judicial determination as to whether a document is exempt from public disclosure.[16] In addition, the attorney general's model rules on public disclosure explain that agencies can seek injunctive relief. WAC 44-14-08004(5)(c).[17]
¶ 60 The Spokesman-Review argues that RCW 42.56.540's reference to agencies does not include the agency denying the record, but instead refers only to other agencies that would be impacted by disclosure. E.g., Answer to Amici at 5-6. In other words, The Spokesman-Review reads RCW 42.56.540 to allow agencies "named in the record or to whom the record specifically pertains" to seek judicial review, and The Spokesman-Review limits this category to those agencies collaterally impacted, but not denying the record themselves. Yet the attorney general's model rules do not coincide with this reading, instead declaring that "[a]n action under this statute can be initiated by the agency, a person named in the disputed record, or a person to whom the record `specifically pertains.'" WAC 44-14-08004(5)(c) (emphasis added). The attorney general's reading is consistent with the plain language of the statute and the legislative history, as well as the last antecedent rule: unless a contrary intention appears in the statute, qualifying words and phrases refer to the last antecedent, absent a comma before the qualifying phrase. City of Spokane v. Spokane County, 158 Wash.2d 661, 673, 146 P.3d 893 (2006). Application of the last antecedent rule to this statute means that the limiting phrase "who is named in the record or to whom the record specifically pertains" applies only to "a person," but not to "an agency or its representative." See RCW 42.56.540. In sum, nothing in the plain language of the statute or the legislative history supports limiting the term "agency" as The Spokesman-Review suggests. Had the legislature intended to prohibit the agency denying the record from seeking judicial review, it would have adopted the proposed provision that said so expressly. The legislature chose otherwise.
¶ 61 Amici point to Dawson, 120 Wash.2d at 794, 845 P.2d 995, to support The Spokesman-Review's position. The Dawson court held that an agency believing that requested documents are protected from disclosure under the language of RCW 42.56.540 may, on its own initiative, seek a court determination of the application of that language. Id. At the same time, the Dawson court held that an agency believing that requested documents are covered by other specific exemptions *81 listed in the Public Records Act, may withhold disclosure until the requesting party initiates a court action to compel disclosure. Id. However, the Dawson court's procedural distinction between RCW 42.56.540 and the other specific exemptions in the act was based on the fact that the court read RCW 42.56.540 to create an independent basis for withholding documents. Id. We have since rejected that notion, concluding instead that RCW 42.56.540 governs access to the injunctive remedy, not the substantive basis for that remedy. Progressive Animal Welfare Soc'y (PAWS) v. Univ. of Wash., 125 Wash.2d 243, 257-58, 884 P.2d 592 (1994). Thus, to the extent that the Dawson court held that where a specific exemption is claimed, the agency must wait for the requester to initiate court action, that conclusion should not survive our subsequent holding in PAWS. If an agency-initiated action were possible only when the agency claimed an exemption under RCW 42.56.540, but pursuant to PAWS, an independent exemption does not exist under RCW 42.56.540, then agencies would never be able to initiate an action, a result clearly contrary to the plain language and the legislative history of RCW 42.56.540. We acknowledge the plain language and conclude that an agency can initiate court action pursuant to RCW 42.56.540, but to prevail, the agency must show that one of the Public Records Act's exemptions applies.[18]
¶ 62 The Spokesman-Review also complains that the agency failed to deny The Spokesman-Review access to the record before filing an action in superior court. We agree that the school district should have responded in a timely manner to the reporter's public records request in one of the three ways listed in RCW 42.56.520 (formerly RCW 42.17.320). The agency must either provide the records, provide a reasonable estimate of the time the agency will take to respond to the request, or deny the request. Id. But this requirement does not, in and of itself, prevent the agency from denying the request, and also seeking judicial determination as to whether the denial was proper.
¶ 63 Per Diem Penalties: We take this opportunity to clarify our holdings with regard to per diem penalties. The Court of Appeals implied that the agency can be spared per diem penalties if it initiates an action in superior court. Soter, 131 Wash. App. at 907, 130 P.3d 840. That reasoning does not coincide with our holding that once a court determines that a requester was entitled to inspect public records, the trial court is required to impose a penalty within the statutory range for each day records were withheld. Koenig v. City of Des Moines, 158 Wash.2d 173, 189, 142 P.3d 162 (2006). The trial court may not reduce the penalty period, even if the requester could have filed suit against the agency sooner than it did. Yousoufian, 152 Wash.2d at 438, 98 P.3d 463. As amici explain, the advantage to going to court is that the agency can obtain quick judicial review, curbing, but not eliminating, the accumulation of the per diem penalties. Br. of Amici Schools Risk Mgmt. Pool at 18.
¶ 64 Findings Required for Injunction: The Court of Appeals also explained that if a specific exemption applies, the trial court can ignore the remaining requirements of RCW 42.56.540. Specifically, the Court of Appeals reasoned that "[w]e may presume the legislature created the exemption because it determined that harm to the agency would outweigh the benefit to the requester," and thus, no additional findings are necessary to support an injunction under RCW 42.56.540. Soter, 131 Wash.App. at 902, 130 P.3d 840. It may be that in most cases where a specific exemption applies, disclosure would also irreparably harm a person or a vital government interest. But if we assume that the additional findings contemplated by RCW 42.56.540 are unnecessary, then a significant portion of the statute is rendered *82 superfluous. See Whatcom County v. City of Bellingham, 128 Wash.2d 537, 546, 909 P.2d 1303 (1996). We therefore clarify that to impose the injunction contemplated by RCW 42.56.540, the trial court must find that a specific exemption applies and that disclosure would not be in the public interest and would substantially and irreparably damage a person or a vital government interest. RCW 42.56.540.
¶ 65 In sum, we hold that the plain language of RCW 42.56.540 allows agencies to seek judicial determination regarding the validity of a public record. We emphasize that the agency remains subject to per diem penalties for each day that it has improperly denied access to a public record. We also recognize that RCW 42.56.540 contains its own express requirements that must be analyzed in any action brought under that section.
¶ 66 Attorney Fees: At the Court of Appeals, The Spokesman-Review requested attorney fees, Brief of Appellant at 46, but because The Spokesman-Review is not the prevailing party, we decline to award attorney fees.

III

Conclusion
¶ 67 We affirm the Court of Appeals with regard to the specific records at issue here. The requested records were relevant to a controversy to which the school district was a party and the records would not have been available under the civil rules of pretrial discovery because they were protected by either the work product doctrine or they reflected attorney-client privileged communications.
¶ 68 We hold that the plain language of RCW 42.56.540 allows agencies to seek a judicial determination as to whether a requested public record must be disclosed. However, if an agency has improperly denied a requester access to a public record, per diem penalties apply for everyday that access was denied. We affirm the Court of Appeals.
ALEXANDER, C.J., OWENS and FAIRHURST, JJ., concur.
MADSEN, J. (concurring).
¶ 69 The dissent addresses strong policy arguments in favor of public disclosure, but I join the majority because it is correct on the law that the legislature has enacted. Whether a lawsuit has actually been commenced does not define when a controversy exists, Dawson v. Daly, 120 Wash.2d 782, 845 P.2d 995 (1993), and whether a controversy has been resolved does not define the boundaries of records that "would not be available to another party under the rules of pretrial discovery for causes pending in the superior courts." RCW 42.56.290.
¶ 70 However strong the policies favoring disclosure, every exemption included in the public disclosure act, chapter 42.56 RCW, results from a deliberate weighing of competing interests by the legislature, and it is the legislature's province to amend a statute, not this court's.
FAIRHURST, J., concurs.
C. JOHNSON, J.(dissenting).
¶ 71 The majority erroneously expands the scope of what have been narrow exemptions to the public disclosure act, formerly chapter 42.17 RCW. In doing so the majority fails not only to effectuate the mandate of the act, but also expansively denies disclosure in this case where, both legally and factually, no basis exists to withhold disclosure. The majority essentially creates a public nondisclosure act, turning the act inside out so that documents are withheld from the public unless the public can demonstrate that no remotely connected litigation exists, past, present, or future. The result of this broad, expansive extension of what should be and have been narrowly crafted exemptions, is well beyond the exemptions' intended parameters, past any meaningful limitation, ultimately encouraging public agencies to hide public records from the public.

CONTROVERSY EXEMPTION
¶ 72 The majority correctly recites the statutory provision, RCW 42.56.290 (formerly RCW 42.17.310(1)(j) (2004)), exempting from public disclosure, "[r]ecords that are relevant to a controversy to which an agency is a *83 party but which records would not be available to another party under the rules of pretrial discovery for causes pending in superior courts." The majority misapplies the exemption in this case in two respects. First, at the time the investigator conducted the interviews no controversy or legal action existed. Second, at the time the superior court considered the disclosure request, the controversy was over.
¶ 73 The plain language of the statute requires that an agency be a party to a controversy before the exemption applies. Here, the documents sought consist of the investigator's interview notes with individuals who have or might have some knowledge of the underlying incident. In this case, the investigator conducted witness interviews the weekend after the incident, well before any claim was brought. The fact that later a claim was brought by the parents should not be a basis to broadly expand the statutory exemption beyond its purposes. Similarly, once the controversy is over, as occurred in this case, the exemption should no longer apply.
¶ 74 We should recognize the purposes underlying this statutory exemption and narrowly apply it only where those purposes exist. The exemption exists to protect the public, and the public agency, in those instances where disclosure of public records would negatively impact the public interest in the course of litigation or in resolving a legal controversy. Applying the exemption in this narrow context makes sense where disclosure would somehow benefit someone in pursuing a claim against the public. However, where no controversy exists, or where the controversy has ended, these purposes are no longer implicated.
¶ 75 Sadly, under the majority's broad application of the exemption to the facts of this case, public agencies will be encouraged to request their counsel to hire investigators to look into incidents, the result being that all those public records are exempt from disclosure forever, even where no controversy exists. The majority simply misapplies the statutory exemption to this case where no controversy exists.

WORK PRODUCT EXEMPTION
¶ 76 Separate from the statutory controversy exemption, but in many respects similar, is the judicially created "work product" exemption. The majority in its extensive analysis of this exemption expands the exemption far beyond any limitation. The majority's result is inconsistent with the holdings of our cases recognizing the narrow limitations of the exemption.
¶ 77 The foundation and parameters for the work product exemption was extensively discussed and analyzed in Limstrom v. Ladenburg, 136 Wash.2d 595, 963 P.2d 869 (1998). In Limstrom we emphasized that the work product exemption does not extend to cover all written materials prepared and obtained by counsel with an eye toward litigation. Limstrom, 136 Wash.2d at 610, 963 P.2d 869. We held in Limstrom that the exemption is intended to protect either communications between an attorney and client, or materials that reveal an attorney's thoughts, strategies, or mental impressions, relevant to representing or communicating with an agency. We did not hold the exemption was intended to protect materials containing factual information of public interest and mandated for disclosure under the act. Work product is not an absolute protection from disclosure, particularly in the context of the broad mandate for public access to agency documents.
¶ 78 The documents in this case were created by an outside investigator hired to objectively uncover the facts surrounding the incident. Because materials were created prior to threat of litigation, the interview and witness in no way reflect an attorney's inner mental impressions and thoughts. In this case, the closest an attorney was to any of the records sought is that the law firm representing the school district hired the investigator who conducted the interviews. Responses to questions about "who are you?" and "what do you know about the incident?" in no way reflect the type of matter the exemption was intended to protect.
¶ 79 In many ways, the investigator's notes are similar to the police reports we determined were disclosable in Cowles Publishing *84 Co. v. Spokane Police Department, 139 Wash.2d 472, 987 P.2d 620 (1999). There, as in this case, the investigator (a police officer) took statements from witnesses concerning an incident. The statements were prepared for the attorney's review and potential use, if relevant to the proceeding. Here, as in Cowles, we have similar factual recitations prepared by an investigator, none of which should be exempt from disclosure.
¶ 80 This is similar to the situation in Limstrom where this court sent the requested files back to the trial court for an in camera review to determine what portions, if any, were to be redacted from the prosecutor's files containing narrative field reports, arrest reports, court documents, and notes of deputy prosecutors. This review was to be conducted within the purposes of the act "to ensure the sovereignty of the people and the accountability of the governmental agencies that serve them." Limstrom, 136 Wash.2d at 607, 963 P.2d 869. We found, in keeping with the mandate to narrowly construct exemptions to the act, that it was not appropriate to broadly interpret the work product exemption to cover everything in the files.
¶ 81 In this case, the majority leaps to the conclusion that, because the district's attorneys hired the investigator, then automatically the investigation notes must be protected by attorney work product exemption. This conclusion is unsupported by our prior cases and disregards our responsibility to apply exemptions narrowly. The Court of Appeals should be reversed.
J.M. JOHNSON, SANDERS and CHAMBERS, JJ., concur.
NOTES
[1] Of the remaining documents not produced, six are no longer being sought. Two have been disclosed.
[2] This case also originally involved a request for records regarding another student injury. That part of this case settled.
[3] An official in the Department of Education had warned that the investigation records and the settlement agreement would be protected by FERPA and could not be disclosed absent parental consent.
[4] Cowles Publishing Company is the publisher of The Spokesman-Review newspaper. We refer to both the newspaper and the publishing company as The Spokesman-Review in this opinion.
[5] Nathan's father later moved for an order dismissing him from the case, which the court granted. While she did not submit any briefing, Nathan's mother remains a party to the case.
[6] It simply defies common sense to suggest the school district was somehow unreasonable in its immediate anticipation of litigation in this case. Dissent at 82-83, 83.
[7] Collins v. Mullins, 170 F.R.D. 132, 133 (W.D.Va.1996), a case discussed by amici, is distinguishable because the records at issue there were not created by attorneys or members of the litigation team in anticipation of imminent litigation. Instead they were routinely created and maintained by the agency. Id. at 133, 136.
[8] The only difference is that Fed.R.Civ.P. 26(b)(3) refers to "party," while Washington's CR 26(b)(4) uses the pronoun "he."
[9] The Spokesman-Review and the dissent argue that CR 26(b)(4) should not apply where the notes were created by the legal team's investigator, rather than an attorney. By its plain language, CR 26(b) applies equally to the impressions, conclusions, opinions of other representatives of a party. Prescott was a member of the legal team and he labored with the benefit of detailed discussions regarding the factual and legal strategies that the attorneys intended to pursue. CP at 536-37. The United States Supreme Court has acknowledged that under the nearly identical federal rule, the work product doctrine protects "material[s] prepared by agents for the attorney as well as those prepared by the attorney himself." United States v. Nobles, 422 U.S. 225, 238-39, 95 S.Ct. 2160, 45 L.Ed.2d 141 (1975). Therefore, we conclude that Prescott's handwritten notes should be treated no differently from the attorneys'.
[10] Limstrom was a plurality opinion, with one justice concurring in result only. But the dissent did not take issue with the plurality's analysis of CR 26(b)(4), arguing instead that the criminal, rather then the civil, rule should be applied and that the prosecutor in that case failed to adequately provide an index of the records at issue. Limstrom, 136 Wash.2d at 617-19, 963 P.2d 869 (Dolliver, J., dissenting).
[11] Some federal and state courts have adopted this approach, allowing factual statements in the legal team's notes to be disclosed, so long as explicit indications of the legal team's strategies and opinions are redacted and so long as the party seeking access has shown substantial need and an inability to elsewhere obtain the substantial equivalent information. E.g., Duplan Corp. v. Chavanoz, 509 F.2d 730, 736-37 (4th Cir.1974); In re Royal Ahold N.V. Sec. & ERISA Litig., 230 F.R.D. 433, 436-37 (D.Md.2005); Longs Drug Stores v. Howe, 134 Ariz. 424, 657 P.2d 412, 418 (1983) (allowing redaction but only where opposing party could not conduct own interview of witnesses); State v. Zwicker, 151 N.H. 179, 855 A.2d 415, 425-26 (2004); People v. Boclair, 119 Ill.2d 368, 116 Ill.Dec. 545, 519 N.E.2d 437, 440 (1987); Leede Oil & Gas, Inc. v. McCorkle, 789 S.W.2d 686, 686-87 (Tex.App.1990) (where witness had died, purely factual statements in interview notes could be revealed). But others have held that documents containing the legal team's notes about interviews with witnesses are protected absent extraordinary circumstances, such as crime or fraud. In re Allen, 106 F.3d at 608 (information gained from a witness interview and memorialized in a summary "tends to indicate the focus of . . . investigation"); Cox, 17 F.3d at 1422 (an attorney's notes and memoranda of witness's oral statements are highly protected opinion work product); In re Sealed Case, 219 U.S.App. D.C. 195, 676 F.2d 793, 805 n. 36, 811 (1982); see also In re Grand Jury Investigation, 599 F.2d 1224, 1231-32 (3d Cir.1979) (allowing disclosure of attorney's interview notes, with redaction of explicit opinions and strategies, only where witness had died; otherwise recognizing that memoranda summarizing interviews may indirectly reveal the legal team's mental processes); Bristol-Meyers v. Fed. Trade Comm'n, 194 U.S.App. D.C. 99, 598 F.2d 18, 30 n. 23 (1978) (recognizing that it is especially difficult to redact to reveal only facts because "counsel's consideration and weighing of the facts is very much a part of his tactical and strategic analysis"); Hollinger Int'l Inc. v. Hollinger Inc., 230 F.R.D. 508, 512 (N.D.Ill.2005) (classifying notes from witness interviews as classic opinion work product).
[12] The dissent relies on Cowles Publishing Co. v. Spokane Police Department, 139 Wash.2d 472, 987 P.2d 620 (1999). But that case is clearly distinguishable because it involved an entirely different exception to the public disclosure act than is at issue here. Id. at 474, 987 P.2d 620 (discussing the investigative records exception, not the controversy exception). While dicta in that case explains that generally police investigative records are not the prosecutor's work product, the opinion does not deal with a situation where, as here, the investigator has been hired by and closely directed by the attorney. Id. at 478, 987 P.2d 620.
[13] Even a cursory review of the record reveals that the dissent misstates the facts. For example, the dissent asserts that the materials at issue "were created prior to threat of litigation." Dissent at 83. But this simply is not true; while not all of the records are dated, at least 32 of the documents are dated after the Walters family hired an attorney to represent them, and after that attorney informed the school district that the family intended to file a claim. CP at 395; Documents 8, 27, 29, 31-36, 38, 42-46, 48-51, 53, 55-56, 58-63, 65, 67-69. Moreover, as discussed above, the school district reasonably anticipated the Walters family's claim from the day of Nathan's death; the threat of litigation began immediately and each of the documents was created in the course of the school district's preparation to defend itself in a lawsuit. E.g., CP at 517-19.

The dissent also asserts that "the closest an attorney was to any of the records sought is that the law firm representing the school district hired the investigator who conducted the interviews." Dissent at 83. But more than 30 of the records sought were actually drafted by one of the attorneys. Index at 1-15. The dissent's assertion also ignores the fact that the investigator was hired solely to help defend the school district against litigation, the attorneys directed the investigator to ask specific questions of specific witnesses, and the attorneys ordered the investigator to meet with them before and after every witness interview. CP at 536-38; see also CP at 391-95, 403-04, 517-25, 555-56.
[14] The dissent suggests that we remand to the trial court for determination of whether the records at issue should be disclosed. The Limstrom court remanded because the lower court had yet to view the records in camera and apply the analysis adopted by the Limstrom court on appeal. Dissent at 84; Limstrom, 136 Wash.2d at 612, 963 P.2d 869. Here, both the lower court and this court have had the relevant documents available for in camera review, and thus we have been able to engage in the very analysis that the Limstrom court adopted.
[15] We recently recognized that even absent an existing controversy, RCW 5.60.060(2)(a) is an "other statute" which justifies exemption of attorney-client privileged communications. Hangartner v. City of Seattle, 151 Wash.2d 439, 452-53, 90 P.3d 26 (2004). But because this case falls squarely within RCW 42.56.290's controversy requirement, and CR 26(b)(1) protects privileged communications, we need not rely on RCW 5.60.060 in this case.
[16] The Spokesman-Review offers several policy arguments as to why it believes agencies should not be permitted to initiate review by a superior court. E.g., Pet. for Review at 9-10. For example, The Spokesman-Review asserts that agencies will be encouraged to haul records requesters, who are unable to afford to defend themselves, into court. However, a public records requester who does not wish to engage in a court battle could simply withdraw the public records request, making the agency's action moot. In addition, the requester could move for voluntary dismissal of the action if he or she no longer seeks access to the public record. CR 41(a). Withdrawing the record request is not significantly different from deciding to no longer pursue access to the record. Thus, we perceive no chilling effect on record requesters. And the Court of Appeals noted, if a record requester chooses to move forward and prevails, he or she would recover all costs and reasonable attorney fees. RCW 42.56.550(4). More importantly, these are arguments more properly presented to the legislature, which is the entity charged with balancing these policy decisions. We cannot ignore the plain language or the legislative history of RCW 42.56.540.
[17] The Spokesman-Review relies in part on City of Burlington v. Boney Publishers, Inc., 166 N.C.App. 186, 600 S.E.2d 872 (2004). But the plain language of the North Carolina statute at issue in that case allows only persons denied access to a public record to seek a court order compelling disclosure. Id. at 876 (quoting N.C. Gen.Stat. § 132-9(a) (2003)).
[18] The Spokesman-Review asserts that the Court of Appeals in this case treated RCW 42.56.540 as an independent exemption from disclosure, ignoring our holding in PAWS. A more fair characterization of the Court of Appeals opinion is that it failed to make it clear that RCW 42.56.540 "merely creates an injunctive remedy, and is not a separate substantive exemption." PAWS, 125 Wash.2d at 257, 884 P.2d 592. The Spokesman-Review is correct that to warrant an injunction preventing disclosure, a public record must fall within a specific exemption under the Public Records Act. Id.